THE PEOPLE OF THE STATE OF NEW YORK ex rel. JOHN HILL, Respondent, *v.* HENRY HESTERBERG, as Sheriff of the County of Kings, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. AUGUST SILZ, Respondent, *v.* HENRY HESTERBERG, as Sheriff of the County of Kings, Appellant.

1. CONSTITUTIONAL LAW — FOREST, FISH AND GAME LAW — PROVISION PROHIBITING POSSESSION OF GAME DURING CLOSE SEASON CONSTITUTIONAL (CONST. ART. 1, § 6). The provisions of the Forest, Fish and Game Law (L. 1900, ch. 20, as amd. by L. 1902, ch. 194; L. 1902, ch. 317, and L. 1904, ch. 588), prohibiting the possession of game coming from without the state during the close season is not unconstitutional as a deprivation of property without due process of law and is a valid exercise of the police power of the state.

2. POWER OF CONGRESS TO AUTHORIZE ENACTMENT OF NEW YORK STATE LAW PROHIBITING IMPORTATION AND POSSESSION OF FOREIGN GAME DURING CLOSE SEASON. Congress can authorize an exercise of the police power by a state, which without such authority would be an unconstitutional interference with commerce; and the act of Congress, passed May 25, 1900, providing, "That all dead bodies or parts thereof, of any foreign game animals, or game or song birds, the importation of which is prohibited, or the dead bodies or parts thereof, of any wild game animals, or game or song birds transported into any state or territory, or remaining therein for use, consumption, sale, or storage therein, shall upon arrival in such state or territory be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such animals or birds had been produced in such state or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise," confers upon the state of New York the power to enact laws prohibiting the possession of the bodies or flesh of game animals or birds, within certain periods, whether the same be taken within the state or imported from another state or from foreign countries.

3. CONSTRUCTION OF COMPLAINT UPON WHICH WARRANT FOR VIOLATION OF GAME LAW IS ISSUED. Where the affidavit upon which a warrant was issued for the arrest of a defendant for violating the provisions of the Forest, Fish and Game Law states that the defendant had in his possession, within the prohibited time, certain dead game birds, to wit, one imported golden plover and one imported grouse, the further statement "That said imported golden plover and imported grouse are different varieties of game birds from the game birds known as plover and grouse

in the state of New York, and from any birds native to America. They are different in form, shape, size, color and marking from the game birds known as plover and grouse in the state of New York," cannot be urged as a defense, since such statement should be construed as meaning, not that the bird so possessed was not a grouse, but that it was a different variety of grouse. different in form, shape and color, from that which is native to the state of New York; it is for the legislature to determine how far it is necessary or wise to include within the penal provisions of the statute birds of the same family and of a similar character though differing in some respects.

*Matter of Hill,* 109 App. Div. 917, reversed; *People ex rel. Silz* v. *Hesterberg,* 109 App. Div. 295, reversed.

(Argued January 22, 1906; decided February 27, 1906.)

Appeal in each of the above-entitled proceedings from an order of the Appellate Division of the Supreme Court in the second judicial department, entered November 29, 1905, which reversed an order of Special Term quashing a writ of habeas corpus and directing that the relators be discharged from the custody of the defendant.

The facts, so far as material, are stated in the opinion.

*Julius M. Mayer, Attorney-General (Alexander T. Mason* of counsel), for appellant. The provisions of the Forest, Fish and Game Law prohibiting the possession of plover and grouse during the close season apply to all kinds and varieties of plover and grouse, whether produced in this state or imported here from abroad. (L. 1900, ch. 20; L. 1902, ch. 194; L. 1902, ch. 317; L. 1904, ch. 588, §§ 106, 108, 140, 141; *Rosenplaenter* v. *Roessle,* 54 N. Y. 265.) The Game Law as above construed is a fair, reasonable and appropriate exercise of the police power of the state. (*Lawton* v. *Steele,* 152 U. S. 133; *Phelps* v. *Racey,* 60 N. Y. 10; *Roth* v. *State,* 51 Ohio St. 209; *Javins* v. *United States,* 11 App. Cas. [D. C.] 345; *State* v. *Farrell,* 23 Mo. App. 176; *Commonwealth* v. *Savage,* 155 Mass. 278; *Whitehead* v. *Smithers,* L. R. [2 C. P. D.] 553; *Ex parte Maier,* 103 Cal. 479; *Magner* v. *People,* 97 Ill. 331; *Merritt* v. *People,* 48 N. E. Rep. 325; *State* v. *Randolph,* 1 Mo. App. 15.) The act of the legislature making the possession of imported

game unlawful does not violate the provisions of the State or Federal Constitutions. (*People* v. *Bootman*, 180 N. Y. 1; *Alexander* v. *Worthington*, 5 Md. 488; *Michael* v. *Morey*, 26 Md. 261; *Rohrbach* v. *G. F. I. Co.*, 62 N. Y. 47; *Geer* v. *Connecticut*, 161 U. S. 519; *Matter of Rahrer*, 140 U. S. 545; *Rhodes* v. *Iowa*, 170 U. S. 412; *Vance* v. *N. A. V. Co.*, 170 U. S. 438; *Matter of Van Vliet*, 43 Fed. Rep. 761; *Matter of Speckler*, 43 Fed. Rep. 653; *State* v. *Bixman*, 162 Mo. 1; *Matter of Bergen*, 115 Fed. Rep. 339; *Storace* v. *Rossi*, 69 Vt. 353; *State* v. *Intoxicating Liquor*, 95 Me. 140.) The provisions of the Lacey Act relate to foreign as well as to interstate commerce, and birds imported into New York state from a foreign country are subject upon arrival to the police laws of the state. (*A. S. Co.* v. *Speed*, 192 U. S. 519; *Brown* v. *State*, 12 Wheat. 419; *May* v. *New Orleans*, 178 U. S. 496.)

*John F. Clarke, District Attorney* (*Robert H. Elder* of counsel), for appellant. Congress on May 25, 1900, passed the so-called Lacey Act, which subjected game taken without the state and imported therein to the police laws of the state. This law had the effect of making local police law operative as to such importations to the full extent of the purpose and end of such statute of Congress. (*Vance* v. *Vandercook Co.*, 170 U. S. 438; *People* v. *Bootman*, 180 N. Y. 1.) The theory advanced by the learned court below that the Lacey Act in extending the application of local police laws has no reference to birds imported from foreign states but only to those imported from domestic states is inaccurate. (*People* v. *Bootman*, 180 N. Y. 1.)

*Edward Lauterbach, Edward R. Finch* and *John B. Coleman* for August Silz, respondent. The possession of the birds admitted to have been possessed by Silz is not forbidden by the provisions of chapter 20 of the Laws of 1900 known as the Forest, Fish and Game Law. (*People* v. *B. F. Co.*, 164 N. Y. 93; *Savings Bank* v. *U. S.*, 86 U. S. 227; *People* v.

*Bootman,* 180 N. Y. 1.) The question as to the constitutionality of the provisions of the Forest, Fish and Game Law, as applied to the case at bar, is not controlled by the decision in the case of *People* v. *Bootman* (180 N. Y. 1). (*Matter of Hearst* v. *Woelper,* 183 N. Y. 274; *A. S. Co.* v. *Speed,* 192 U. S. 519.) The provisions of the Forest, Fish and Game Law are unconstitutional in that they deprive the individual of his property without due process of law. (*Geer* v. *Connecticut,* 161 U. S. 519; *People* v. *A. B. Co.,* 42 Misc. Rep. 329; *Foster* v. *Scott,* 136 N. Y. 577; *People* v. *Bootman,* 95 App. Div. 469; *People* v. *Marx,* 99 N. Y. 377; *People* v. *Biesecker,* 169 N. Y. 53.) The provisions of the Forest, Fish and Game Law are unconstitutional, in that they unjustifiably restrict and interfere with foreign commerce. (*Bowman* v. *C. & N. W. Ry. Co.,* 125 U. S. 465; *Leisy* v. *Hardin,* 135 U. S. 100; *Matter of Rahrer,* 140 U. S. 545; *Vance* v. *Vandercook,* 170 U. S. 545; *Rhodes* v. *Iowa,* 170 U. S. 412; *Colon* v. *Lisk,* 153 N. Y. 196; *Forster* v. *Scott,* 136 N. Y. 584; *Mugler* v. *Kansas City,* 123 U. S. 661; *Robbins* v. *S. T. District,* 120 U. S. 493; *People* v. *Hawkins,* 157 N. Y. 1.)

*John L. Hill* for John Hill, respondent.

CULLEN, Ch. J. The relators were arrested on warrants charging them with a violation of the Game Law. They sought discharge from their arrest by writs of *habeas corpus.* On the return to those writs they were remanded to custody. On appeal to the Appellate Division the orders of the Special Term were reversed and the relators discharged from custody. From those orders these appeals are taken. As the affidavits on which the warrants for the arrest of the relators were issued differ materially in their statements of facts, we will first consider the one made in the Hill case. The affidavit avers that on the 3rd day of March said John Hill did have in his possession in the Clarendon Hotel, in the borough of Brooklyn, one dead body of a bird known as a golden plover,

and one dead body of a fowl commonly called a grouse; that, as the affiant was informed and believed, the said plover and grouse were taken without the state of New York, to wit, from England and Russia, and thence brought into the borough of Brooklyn.

The Forest, Fish and Game Law (Chap. 20, Laws 1900, amended chaps. 194 and 317, Laws 1902; chap. 588, Laws 1904), by sections 106 and 108, enacts that grouse shall not be taken or possessed from January 1st to October 31st, nor plover from January 1st to July 15th. By section 140 of said act grouse is defined to include ruffed grouse, partridge and every member of the grouse family. By section 141 the inhibition enacted by the other sections of the statute is made to apply to fish, game or flesh coming from without the state, as well as to that taken within the state. By section 119 any one violating the provisions of the statute hereinbefore recited is guilty of a misdemeanor and liable to a fine of twenty-five dollars for each bird taken or possessed in violation thereof. The relator was in possession of the birds during the prohibited period, and, hence, was guilty of a misdemeanor, unless he is relieved from the penalties prescribed by the statute by the fact that the birds were imported from foreign countries. We shall not discuss at any length the claim of the relator that the statute contravenes the Constitution of this state as depriving the relator of his property without due process of law. That question has been settled adversely to that claim by the decisions of this court in *Phelps* v. *Racey* (60 N. Y. 10) and *People* v. *Bootman* (180 N. Y. 1), in which it was held within the power of the legislature, in order to effect the preservation of game within the state, to enact not only a close season during which the possession of such game should be unlawful, but also to enact that the possession in the state during such season of game taken without the state should be equally unlawful. The *Phelps* case is cited by the Supreme Court of the United States in *Geer* v. *Connecticut* (161 U. S. 519), in which the validity of a statute of that state was upheld, not only on the ground that the original owner-

1906.]     People ex rel. Hill *v*. Hesterberg.          131

N. Y. Rep.]     Opinion of the Court, per Cullen, Ch. J.

ship of wild game is in the state, but on the further ground that the preservation of such game is a valid exercise of the police power of the state.    To the argument that the exclusion of foreign game in no way tends to the preservation of domestic game, it is sufficient to say that substantially the uniform belief of legislatures and people is to the contrary, and that both in England and many of the states in this country legislation prohibiting the possession of foreign game during the close season has been upheld as being necessary to the protection of domestic game, on the ground that without such inhibition or restriction any law for the protection of domestic game could be successfully evaded.    (*Whitehead* v. *Smithers*, L. R. [2 C. P. Div.] 553; *Ex parte Maier*, 103 Cal. 476; *Magner* v. *People*, 97 Ill. 320; *Missouri* v. *Randolph*, 1 Mo. App. 151; *Stevens* v. *State*, 89 Md. 669; *Roth* v. *State*, 51 Ohio St. 209; *Commonwealth* v. *Savage*, 155 Mass. 278.)    The case of *Phelps* v. *Racey* (*supra*) has never been overruled by this court.    In the opinion delivered in *People* v. *Buffalo Fish Company* (164 N. Y. 93) Judge O'Brien took two positions: *First*, that the exclusion of fish taken without the state was invalid as interfering with the power of Congress to regulate foreign and interstate commerce; and, *second*, that under a proper construction of the Game Law as it then stood the statute was applicable only to fish taken within the state.    It was this second ground alone which received the assent of the majority of judges and on which the decision in the case proceeded.    This ground has been removed by the amendment of the statute already cited, which makes it applicable to game taken without the state.    *People* v. *Bootman* (*supra*) re-affirmed the doctrine of *Phelps* v. *Racey* and the validity of the legislation before us, at least so far as the Constitution of this state is involved.    In that case while we affirmed the decision below because the offenses for which the defendant was prosecuted were committed before the amendment to the statute, we felt called upon to express our opinion on the whole subject, so that the citizen might not be misled by the opinion rendered in the court below and thus unwittingly

subject himself to severe penalties. If as is claimed the views then expressed by the court on the subject now before us were obiter and not necessary to the decision made, it is sufficient to say that we adhere to them, not on the ground of *stare decisis* but because they command our approval. Therefore, if the act of Congress, passed May 25th, 1900, commonly termed the " Lacey Act," empowered the state to enact the legislation before us, it is unnecessary for us to enter into any examination of the question of interference with foreign and interstate commerce, discussed, but not decided, in *People* v. *Buffalo Fish Company.*

That Congress can authorize an exercise of the police power by a state, which without such authority would be an unconstitutional interference with commerce, has been expressly decided by the Supreme Court of the United States in *Matter of Rahrer* (140 U. S. 545). The question before us is merely the interpretation of the Lacey Act, which the learned counsel for the respondents contend applies solely to interstate shipments and not to importations from foreign countries. The act is entitled : " An Act to enlarge the powers of the Department of Agriculture, prohibit the transportation by interstate commerce of game killed in violation of local laws, and for other purposes." The first section relates to the department of agriculture ; the second prohibits the importation of any foreign wild animal or bird except under special permit from that department, providing that it shall not restrict the importation of natural history specimens nor caged birds, such as domesticated canaries, parrots and the like. It then forbids absolutely the importation of the mongoose, flying foxes, the English sparrow and such other birds as the secretary of agriculture may deem injurious to the interest of agriculture or horticulture. The third section forbids the delivery to a common carrier for shipment from one state to another of any wild animals or birds killed in the state in violation of its laws. The fifth section deals with the transportation into any state of animals killed without the state. It is as follows : " That all dead bodies or parts thereof, of

any foreign game animals, or game or song birds, the importation of which is prohibited, or the dead bodies or parts thereof, of any wild game animals, or game or song birds transported into any State or Territory, or remaining therein for use, consumption, sale, or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its Police Powers, to the same extent and in the same manner as though such animals or birds had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise. This act shall not prevent the importation, transportation, or sale of birds or bird plumage, manufactured from the feathers of barnyard fowl." It is contended that the title of the statute tends to show that the operation of section 5 is confined to shipment from other states and not to importation from foreign countries. If the title of an act could limit its effect, which it cannot (Potter's Dwarris on Statutes, p. 102), still this claim is without foundation. The first two sections of the act deal with the department of agriculture, and the reference thereto in the title is appropriate. The third and fourth sections deal with interstate transportation of game killed in violation of local laws, and the reference in the title "prohibit the transportation by interstate commerce of game killed in violation of local laws" is equally appropriate. The fifth section, which is the one before us, deals with an entirely different matter, transportation into a state, not out of a state, and is embraced in the title of the statute only under the designation " and for other purposes." As to this subject, therefore, the title in no respect tends to limit the effect of the act. It is difficult to see any reason why Congress should have sought to discriminate between the bodies of game, song birds or wild animals brought into a state from other states and those brought from foreign countries. The object of the legislation was to enable the states by their local law to exercise a power over the subject of the preservation of game and song birds, which without that

legislation they could not exert. Every consideration that led Congress to think it wise to confer on the state of New York, as well as on other states, power (which is practically that of prohibition during the close season, at least for the purposes of sale) over the importation of partridges from New Jersey, Pennsylvania or Connecticut, is equally applicable to the importation of such birds from Canada. The obstacle to the successful enforcement of the game laws of the state would be as great in the one case as the other, and as Canada borders on the United States for a distance of three thousand miles the practical danger would be as great in one case as in the other, whatever it might be in the case of an importation from Europe. But it is said Congress permits the importation of foreign game and collects the duty thereon, and it cannot have intended to allow property thus imported to be confiscated. The proposition that Congress allows the importation of foreign game is true only in a restricted sense. By the "Lacey Act" Congress determined to aid the states in the enforcement of their game laws, but did not deem it wise to enact a game law of its own, and this for the very obvious reason that the game laws of the different states vary greatly, a variation justified in no small degree by varying climatic conditions. It would be unwise to entirely prohibit the importation of game into the country during a part of the year during which in some of the states the taking and consumption of such game is lawful. So Congress practically said to the citizen : We do not prohibit the importation of foreign game, but subject it to the local laws, and you must see to it, at your risk, that you do not violate those laws. The term "transported" is used in the Wilson Act of Congress relative to intoxicating liquors (enacted August 8, 1890), as in the present act. Yet it seems incredible that Congress intended to suffer the state of Maine to seize liquor in original packages when brought from Massachusetts, but not when brought from Canada or Europe. The words of the section before us are sufficiently comprehensive to include all game brought into the state from whatever place, and we do not think it

profitable to enter into a verbal analysis save in one respect. It is urged that the concluding sentence of the section, "This act shall not prevent the importation, transportation or sale of birds or bird plumage manufactured from the feathers of barnyard fowl," excludes all birds from its operation. We think not. The qualification "manufactured from the feathers of barnyard fowl" applies as well to birds as to bird plumage. Birds mentioned in this sentence are plainly artificial birds, and so the treasury department of the United States has ruled.

The case of Silz is somewhat different. The affidavit on which the warrant in this case was issued creates a strong suspicion that the prosecution was instituted by collusion. It states not only that the defendant had in his possession the prohibited game, but also almost every fact by which the defendant's counsel hopes to relieve his client from the penalties of the law, facts which it is difficult if not impossible to see how they could have been within the affiant's knowledge. For that reason we should be inclined to refuse to entertain the cause had not the attorney-general intervened and prosecuted the appeal. Substantially all the questions raised by the affidavit, save one, are disposed of by the views we have already expressed. The exception is the statement in the affidavit "That said imported golden plover and imported grouse are different varieties of game birds from the game birds known as plover and grouse in the state of New York and from any birds native to America. They are different in form, shape, size, color and marking from the game birds known as plover and grouse in the state of New York." Of course if the birds, the possession of which is charged against the relator, are not grouse or birds of the grouse family, then no crime is stated in the affidavit and the relator should be discharged. But in view of the express allegation at the commencement of the affidavit that the defendant was possessed of one imported grouse, we are inclined to the view that the statement quoted should be construed as meaning not that the bird so possessed was not a

grouse, but that it was a different variety of grouse from that which is native to the state of New York. So construed this fact constitutes no defense, nor does the allegation that they are different in form, shape and color from native birds. It was for the legislature to determine, in the protection of native game, how far it was necessary or wise to include within the penal provisions of the statute birds of the same family and of a similar character, though differing in some respects. Of course, this statement is made within limits. To protect pigeons, turkeys could not be excluded. In the present case, however, we are clear that the legislature has acted within its power.

The order of the Appellate Division in each case should be reversed, that of the Special Term affirmed, and the relators remanded to custody.

GRAY, O'BRIEN, EDWARD T. BARTLETT, WERNER, HISCOCK and CHASE, JJ., concur.

Order reversed, etc.