## BALDWIN, COMMISSIONER OF AGRICULTURE & MARKETS, ET AL. *v.* G. A. F. SEELIG, INC.*

No. 604. Argued February 11, 12, 1935.—Decided March 4, 1935.

---

* Together with No. 605, *G. A. F. Seelig, Inc.* v. *Baldwin, Commissioner of Agriculture & Markets, et al.* Appeal from the District Court of the United States for the Southern District of New York.

Mr. *Henry S. Manley*, with whom Mr. *John J. Bennett, Jr.*, Attorney General of New York, and Mr. *Henry Epstein*, Solicitor General, were on the brief, for Baldwin, Commissioner of Agriculture & Markets, et al.

514

516

*Mr. J. Daniel Dougherty,* with whom *Mr. John J. O'Connor* was on the brief, for G. A. F. Seelig, Inc.

518

MR. JUSTICE CARDOZO delivered the opinion of the Court.

Whether and to what extent the New York Milk Control Act (N. Y. Laws of 1933, c. 158; Laws of 1934, c. 126) may be applied against a dealer who has acquired title to the milk as the result of a transaction in interstate commerce is the question here to be determined.

G. A. F. Seelig, Inc. (appellee in No. 604 and appellant in No. 605) is engaged in business as a milk dealer in the city of New York. It buys its milk, including cream, in Fair Haven, Vermont, from the Seelig Creamery Corporation, which in turn buys from the producers on the neighboring farms. The milk is transported to New York by rail in forty-quart cans, the daily shipment amounting to about 200 cans of milk and 20 cans of cream. Upon arrival in New York about 90% is sold to customers in the original cans, the buyers being chiefly hotels, restaurants and stores. About 10% is bottled in New York, and sold to customers in bottles. By concession, title passes from the Seelig Creamery to G. A. F. Seelig, Inc. at Fair Haven, Vermont. For convenience the one company will be referred to as the Creamery and the other as Seelig.

The New York Milk Control Act with the aid of regulations made thereunder has set up a system of minimum prices to be paid by dealers to producers. The validity of that system in its application to producers doing business in New York State has support in our decisions. *Nebbia* v. *New York,* 291 U. S. 502; *Hegeman Farms Corp.* v. *Baldwin,* 293 U. S. 163. Cf. *Borden's Farm Products Co.* v. *Baldwin,* 293 U. S. 194. From the farms of New York the inhabitants of the so-called Metropolitan Milk District, comprising the City of New York and certain neighboring communities, derive about 70% of the milk requisite for their use. To keep the system unimpaired by competition from afar, the Act has a provision whereby the protective prices are extended to that part of the supply (about 30%) which comes from other states. The substance of the provision is that, so far as such a prohibition is permitted by the Constitution, there shall be no sale within the state of milk bought outside unless the price paid to the producers was one that would be lawful upon a like transaction within the state. The statute, so far as pertinent, is quoted in the margin together with supplementary regulations by the Board of Milk Control.[1]

---

[1] Section 258 (m) (4), Article 21-a, New York Agriculture & Markets Law, L. 1934, c. 126, formerly § 312 (g), Article 25, L. 1933, c. 158: "It is the intent of the legislature that the instant, whenever that may be, that the handling within the State by a milk dealer of milk produced outside of the State becomes a subject of regulation by the State, in the exercise of its police powers, the restrictions set forth in this article respecting such milk so produced shall apply and the powers conferred by this article shall attach. After any such milk so produced shall have come to rest within the State, any sale, within the State by a licensed milk dealer or a milk dealer required by this article to be licensed, of any such milk purchased from the producer at a price lower than that required to be paid for milk produced within the State purchased under similar conditions, shall be unlawful."

Seelig buys its milk from the Creamery in Vermont at prices lower than the minimum payable to producers in New York. The Commissioner of Farms and Markets refuses to license the transaction of its business unless it signs an agreement to conform to the New York statute and regulations in the sale of the imported product.[2] This the applicant declines to do. Because of that refusal other public officers, parties to these appeals, announce a purpose to prosecute for trading without a license and to recover heavy penalties. This suit has been brought to restrain the enforcement of the Act in its application to the complainant, repugnancy being charged between its provisions when so applied and limitations imposed by the Constitution of the United States. United States Consti-

---

Order of New York Milk Control Board, July 1, 1933: "Any continuous and regular purchase or sale or delivery or receipt of milk passing to a milk dealer at any place and available for utilization as fluid milk and/or cream within New York State, followed by such utilization in one or more instances, where the price involved in such purchase or sale or delivery or receipt is less than the sum of the minimum price established to be paid to producers for such milk plus actual costs of transporting and handling and processing such milk to the place and to the condition involved in such purchase or sale or delivery or receipt, hereby is forbidden."

[2] The application blank contains the following questions which show the form of the required agreement: " Do you agree not to sell within New York State after it has come to rest within the State, milk or cream purchased from producers without the State at a price lower than that required to be paid producers for milk or cream produced within the State purchased under similar conditions? "

" Do you agree that you will obtain for the Commissioner and supply to him, at such times and in such manner as he requires, concerning milk and cream produced without the State and in any way dealt in by you, data to whatever extent is necessary to ascertain or compute whether the producers were paid for such milk or cream a price not lower than that required to be paid producers for milk or cream produced within New York State and purchased under similar conditions? "

tution, Art. I, § 8, clause 3; Fourteenth Amendment, § 1. A District Court of three judges, organized in accordance with § 266 of the Judicial Code (28 U. S. C. § 380), has granted a final decree restraining the enforcement of the Act in so far as sales are made by the complainant while the milk is in the cans or other original packages in which it was brought into New York, but refusing an injunction as to milk taken out of the cans for bottling, and thereafter sold in bottles. See opinion on application for interlocutory injunction:—7 F. Supp. 776; and cf. 293 U. S. 522. The case is here on cross-appeals. 28 U. S. C. § 380.

*First.* An injunction was properly granted restraining the enforcement of the Act in its application to sales in the original packages.

New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there. So much is not disputed. New York is equally without power to prohibit the introduction within her territory of milk of wholesome quality acquired in Vermont, whether at high prices or at low ones. This again is not disputed. Accepting those postulates, New York asserts her power to outlaw milk so introduced by prohibiting its sale thereafter if the price that has been paid for it to the farmers of Vermont is less than would be owing in like circumstances to farmers in New York. The importer in that view may keep his milk or drink it, but sell it he may not.

Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported. Imposts or duties upon commerce with other countries are placed by an express prohibition of the Constitution, beyond the power of a state, " except what may be absolutely necessary for executing its inspec-

tion laws." Constitution, Art. I, § 10, clause 2; *Woodruff v. Parham,* 8 Wall. 123. Imposts and duties upon interstate commerce are placed beyond the power of a state, without the mention of an exception, by the provision committing commerce of that order to the power of the Congress. Constitution, Art. I, § 8, clause 3. " It is the established doctrine of this court that a state may not, in any form or under any guise, directly burden the prosecution of interstate business." *International Textbook Co.* v. *Pigg,* 217 U. S. 91, 112; and see *Brennan* v. *Titusville,* 153 U. S. 289; *Brown* v. *Houston,* 114 U. S. 622; *Webber* v. *Virginia,* 103 U. S. 344, 351; *Kansas City Southern Ry. Co.* v. *Kaw Valley Drainage District,* 233 U. S. 75, 79. Nice distinctions have been made at times between direct and indirect burdens. They are irrelevant when the avowed purpose of the obstruction, as well as its necessary tendency, is to suppress or mitigate the consequences of competition between the states. Such an obstruction is direct by the very terms of the hypothesis. We are reminded in the opinion below that a chief occasion of the commerce clauses was " the mutual jealousies and aggressions of the States, taking form in customs barriers and other economic retaliation." Farrand, Records of the Federal Convention, vol. II, p. 308; vol. III, pp. 478, 547, 548; The Federalist, No. XLII; Curtis, History of the Constitution, vol. 1, p. 502; Story on the Constitution, § 259. If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation.

The argument is pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other

class or classes. The end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk, the supply being put in jeopardy when the farmers of the state are unable to earn a living income. *Nebbia* v. *New York, supra.* Price security, we are told, is only a special form of sanitary security; the economic motive is secondary and subordinate; the state intervenes to make its inhabitants healthy, and not to make them rich. On that assumption we are asked to say that intervention will be upheld as a valid exercise by the state of its internal police power, though there is an incidental obstruction to commerce between one state and another. This would be to eat up the rule under the guise of an exception. Economic welfare is always related to health, for there can be no health if men are starving. Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.

We have dwelt up to this point upon the argument of the state that economic security for farmers in the milk-shed may be a means of assuring to consumers a steady supply of a food of prime necessity. There is, however, another argument which seeks to establish a relation between the well-being of the producer and the quality of the product. We are told that farmers who are underpaid will be tempted to save the expense of sanitary precautions. This temptation will affect the farmers outside

New York as well as those within it. For that reason the exclusion of milk paid for in Vermont below the New York minimum will tend, it is said, to impose a higher standard of quality and thereby promote health. We think the argument will not avail to justify impediments to commerce between the states. There is neither evidence nor presumption that the same minimum prices established by order of the Board for producers in New York are necessary also for producers in Vermont. But apart from such defects of proof, the evils springing from uncared for cattle must be remedied by measures of repression more direct and certain than the creation of a parity of prices between New York and other states. Appropriate certificates may be exacted from farmers in Vermont and elsewhere (*Mintz* v. *Baldwin*, 289 U. S. 346; *Reid* v. *Colorado*, 187 U. S. 137); milk may be excluded if necessary safeguards have been omitted; but commerce between the states is burdened unduly when one state regulates by indirection the prices to be paid to producers in another, in the faith that augmentation of prices will lift up the level of economic welfare, and that this will stimulate the observance of sanitary requirements in the preparation of the product. The next step would be to condition importation upon proof of a satisfactory wage scale in factory or shop, or even upon proof of the profits of the business. Whatever relation there may be between earnings and sanitation is too remote and indirect to justify obstructions to the normal flow of commerce in its movement between states. Cf. *Asbell* v. *Kansas*, 209 U. S. 251, 256; *Railroad Co.* v. *Husen*, 95 U. S. 465, 472. One state may not put pressure of that sort upon others to reform their economic standards. If farmers or manufacturers in Vermont are abandoning farms or factories, or are failing to maintain them properly, the legislature of Vermont and not that of New York must supply the fitting remedy.

Many cases from our reports are cited by counsel for the state. They do not touch the case at hand. The line of division between direct and indirect restraints of commerce involves in its marking a reference to considerations of degree. Even so, the borderland is wide between the restraints upheld as incidental and those attempted here. Subject to the paramount power of the Congress, a state may regulate the importation of unhealthy swine or cattle (*Asbell* v. *Kansas, supra; Mintz* v. *Baldwin, supra*) or decayed or noxious foods. *Crossman* v. *Lurman,* 192 U. S. 189; *Savage* v. *Jones,* 225 U. S. 501; *Price* v. *Illinois,* 238 U. S. 446. Things such as these are not proper subjects of commerce, and there is no unreasonable interference when they are inspected and excluded. So a state may protect its inhabitants against the fraudulent substitution, by deceptive coloring or otherwise, of one article for another. *Plumley* v. *Massachusetts,* 155 U. S. 461; *Hebe Co.* v. *Shaw,* 248 U. S. 297; *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497. It may give protection to travelers against the dangers of overcrowded highways (*Bradley* v. *Public Utilities Comm'n,* 289 U. S. 92) and protection to its residents against unnecesary noises. *Hennington* v. *Georgia,* 163 U. S. 229. Cf., however, *Missouri, K. & T. Ry. Co.* v. *Texas,* 245 U. S. 484, 488. At times there are border cases, such as *Silz* v. *Hesterberg,* 211 U. S. 31, where the decision in all likelihood was influenced, even if it is not wholly explained, by a recognition of the special and restricted nature of rights of property in game. Interference was there permitted with sale and importation, but interference for a close season and no longer, and in aid of a policy of conservation common to many states. Cf. *Geer* v. *Connecticut,* 161 U. S. 519; *Foster Packing Co.* v. *Haydel,* 278 U. S. 1, 11; *Silz* v. *Hesterberg,* 184 N. Y. 126, 131; 76 N. E. 1032. None of these statutes—inspection laws, game laws, laws intended to curb fraud or exterminate disease—approaches in drastic quality the statute here in contro-

versy which would neutralize the economic consequences of free trade among the states.

*Second.* There was error in refusing an injunction to restrain the enforcement of the Act in its application to milk in bottles to be sold by the importer.

The test of the " original package," which came into our law with *Brown* v. *Maryland,* 12 Wheat. 419, is not inflexible and final for the transactions of interstate commerce, whatever may be its validity for commerce with other countries. Cf. *Woodruff* v. *Parham, supra; Anglo-Chilean Nitrate Sales Corp.* v. *Alabama,* 288 U. S. 218, 226. There are purposes for which merchandise, transported from another state, will be treated as a part of the general mass of property at the state of destination though still in the original containers. This is so, for illustration, where merchandise so contained is subjected to a non-discriminatory property tax which it bears equally with other merchandise produced within the state. *Sonneborn Bros.* v. *Cureton,* 262 U. S. 506; *Texas Co.* v. *Brown,* 258 U. S. 466, 475; *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500. There are other purposes for which the same merchandise will have the benefit of the protection appropriate to interstate commerce, though the original packages have been broken and the contents subdivided. "A state tax upon merchandise brought in from another State, or upon its sales, whether in original packages or not, after it has reached its destination and is in a state of rest, is lawful only when the tax is not discriminating in its incidence against the merchandise because of its origin in another State." *Sonneborn Bros.* v. *Cureton, supra,* at p. 516. Cf. *McDermott* v. *Wisconsin,* 228 U. S. 115, 133; *Bowman* v. *Chicago & N. W. Ry. Co.,* 125 U. S. 465, 491; *Brimmer* v. *Rebman,* 138 U. S. 78; *Savage* v. *Jones, supra,* at p. 525; *Western Union* v. *Foster,* 247 U. S. 105, 114; *Pacific Co.* v. *Johnson,* 285 U. S. 480, 493. In brief, the test of the origi-

nal package is not an ultimate principle. It is an illustration of a principle. *Pennsylvania Gas Co.* v. *Public Service Comm'n,* 225 N. Y. 397, 403; 122 N. E. 260. It marks a convenient boundary and one sufficiently precise save in exceptional conditions. What is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation. Formulas and catchwords are subordinate to this overmastering requirement. Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents. Restrictions so contrived are an unreasonable clog upon the mobility of commerce. They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin. They are thus hostile in conception as well as burdensome in result. The form of the packages in such circumstances is immaterial, whether they are original or broken. The importer must be free from imposts framed for the very purpose of suppressing competition from without and leading inescapably to the suppression so intended.

The statute here in controversy will not survive that test. A dealer in milk buys it in Vermont at prices there prevailing. He brings it to New York, and is told he may not sell it if he removes it from the can and pours it into bottles. He may not do this for the reason that milk in Vermont is cheaper than milk in New York at the regimented prices, and New York is moved by the desire to protect her inhabitants from the cut prices and other consequences of Vermont competition. To overcome that competition a common incident of ownership—the privilege of sale in convenient receptacles—is denied to one who has bought in interstate commerce. He may not sell on any terms to any one, whether the orders were given in

advance or came to him thereafter. The decisions of this court as to the significance of the original package in interstate transactions were not meant to be a cover for retortion or suppression.

The distinction is clear between a statute so designed and statutes of the type considered in *Leisy* v. *Hardin,* 135 U. S. 100, to take one example out of many available. By the teaching of that decision intoxicating liquors are not subject to license or prohibition by the state of destination without congressional consent.[3] They become subject, however, to such laws when the packages are broken. There is little, if any, analogy between restrictions of that type and those in controversy here. In licensing or prohibiting the sale of intoxicating liquors a state does not attempt to neutralize economic advantages belonging to the place of origin. What it does is no more than to apply its domestic policy, rooted in its conceptions of morality and order, to property which for such a purpose may fairly be deemed to have passed out of commerce and to be commingled in an absorbing mass. So also the analogy is remote between restrictions like the present ones upon the sale of imported milk and restrictions affecting sales in unsanitary sweat-shops. It is one thing for a state to exact adherence by an importer to fitting standards of sanitation before the products of the farm or factory may be sold in its markets. It is a very different thing to establish a wage scale or a scale of prices for use in other states, and to bar the sale of the products, whether in the original packages or in others, unless the scale has been observed.

The decree in No. 604 is affirmed, and that in No. 605 reversed, and the cause remanded for proceedings in accordance with this opinion.

*No. 604. Affirmed.*
*No. 605. Reversed.*

---

[3] The rule is different today under the Twenty-first Amendment. Art. XXI, § 2.