# CITY OF PHILADELPHIA ET AL. *v.* NEW JERSEY ET AL.

No. 77–404.  Argued March 27, 1978—Decided June 23, 1978

STEWART, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, post, p. 629.

*Herbert F. Moore* argued the cause for appellants. With him on the briefs was *Arthur Meisel.*

*Stephen Skillman,* Assistant Attorney General of New Jersey, argued the cause for appellees. With him on the brief were *John J. Degnan,* Attorney General, and *Deborah Poritz* and *Nathan Edelstein,* Deputy Attorneys General.*

MR. JUSTICE STEWART delivered the opinion of the Court.

A New Jersey law prohibits the importation of most "solid or liquid waste which originated or was collected outside the territorial limits of the State . . . ." In this case we are required to decide whether this statutory prohibition violates the Commerce Clause of the United States Constitution.

## I

The statutory provision in question is ch. 363 of 1973 N. J. Laws, which took effect in early 1974. In pertinent part it provides:

> "No person shall bring into this State any solid or liquid waste which originated or was collected outside the territorial limits of the State, except garbage to be fed to swine in the State of New Jersey, until the commissioner '[of the State Department of Environmental Protection] shall determine that such action can be permitted without endangering the public health, safety and

*M. Jefferson Davis* and *Michael J. Hogan* filed a brief for the Board of Chosen Freeholders of the County of Burlington, N. J., as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Jeffrey B. Schwartz* for the American Public Health Assn.; and by *William C. Brashares* for the National Solid Wastes Management Assn.

welfare and has promulgated regulations permitting and regulating the treatment and disposal of such waste in this State." N. J. Stat. Ann. § 13:1*I*–10 (West Supp. 1978).[1]

As authorized by ch. 363, the Commissioner promulgated regulations permitting four categories of waste to enter the State.[2] Apart from these narrow exceptions, however, New Jersey closed its borders to all waste from other States.

Immediately affected by these developments were the operators of private landfills in New Jersey, and several cities in other States that had agreements with these operators for waste disposal. They brought suit against New Jersey and its Department of Environmental Protection in state court, attacking the statute and regulations on a number of state and federal grounds. In an oral opinion granting the plaintiffs' motion for summary judgment, the trial court declared the law unconstitutional because it discriminated against interstate commerce. The New Jersey Supreme Court consolidated this case with another reaching the same conclusion,

---

[1] New Jersey enacted a Waste Control Act, N. J. Stat. Ann. § 13:1*I*–1 et seq. (West Supp. 1978), in early 1973. This Act empowered the State Commissioner of Environmental Protection to promulgate rules banning the movement of solid waste into the State. Within a year, the state legislature enacted ch. 363, which reversed the presumption and blocked the importation of all categories of waste unless excepted by rules of the Commissioner.

[2] Effective as of February 1974, these regulations provided as follows:

"(a) No person shall bring into this State, or accept for disposal in this State, any solid or liquid waste which originated or was collected outside the territorial limits of this State. This Section shall not apply to:

"1. Garbage to be fed to swine in the State of New Jersey;

"2. Any separated waste material, including newsprint, paper, glass and metals, that is free from putrescible materials and not mixed with other solid or liquid waste that is intended for a recycling or reclamation facility;

"3. Municipal solid waste to be separated or processed into usable secondary materials, including fuel and heat, at a resource recovery facility

*Hackensack Meadowlands Development Comm'n* v. *Municipal Sanitary Landfill Auth.*, 127 N. J. Super. 160, 316 A. 2d 711, and reversed, 68 N. J. 451, 348 A. 2d 505. It found that ch. 363 advanced vital health and environmental objectives with no economic discrimination against, and with little burden upon, interstate commerce, and that the law was therefore permissible under the Commerce Clause of the Constitution. The court also found no congressional intent to pre-empt ch. 363 by enacting in 1965 the Solid Waste Disposal Act, 79 Stat. 997, 42 U. S. C. § 3251 *et seq.*, as amended by the Resource Recovery Act of 1970, 84 Stat. 1227.

The plaintiffs then appealed to this Court.[3] After noting probable jurisdiction, 425 U. S. 910, and hearing oral argument, we remanded for reconsideration of the appellants' pre-emption claim in light of the newly enacted Resource Conservation and Recovery Act of 1976, 90 Stat. 2795. 430 U. S. 141. Again the New Jersey Supreme Court found no federal pre-emption of the state law, 73 N. J. 562, 376 A. 2d 888, and again we noted probable jurisdiction, 434 U. S. 964. We agree with the New Jersey court that the state law has not been pre-empted by federal legislation.[4] The dispositive

---

provided that not less than 70 per cent of the thru-put of any such facility is to be separated or processed into usable secondary materials; and

"4. Pesticides, hazardous waste, chemical waste, bulk liquid, bulk semiliquid, which is to be treated, processed or recovered in a solid waste disposal facility which is registered with the Department for such treatment, processing or recovery, other than by disposal on or in the lands of this State." N. J. Admin. Code 7:1–4.2 (Supp. 1977).

[3] The decision of the New Jersey Supreme Court disposed of the appellants' pre-emption and Commerce Clause claims, but remanded the case to the trial court for further proceedings on the other claims. The appellants then dismissed with prejudice the other counts in their complaint so that there would be a final judgment from which they could appeal to this Court.

[4] The surviving provisions of the 1965 Solid Waste Disposal Act, 79 Stat. 997, the Resource Discovery Act of 1970, 84 Stat. 1227, and the Resource

question, therefore, is whether the law is constitutionally permissible in light of the Commerce Clause of the Constitution.[5]

## II

Before it addressed the merits of the appellants' claim, the New Jersey Supreme Court questioned whether the interstate movement of those wastes banned by ch. 363 is "commerce" at all within the meaning of the Commerce Clause. Any doubts on that score should be laid to rest at the outset.

The state court expressed the view that there may be two definitions of "commerce" for constitutional purposes. When relied on "to support some exertion of federal control or regulation," the Commerce Clause permits "a very sweeping concept" of commerce. 68 N. J., at 469, 348 A. 2d, at 514. But when relied on "to strike down or restrict state legislation," that Clause and the term "commerce" have a "much more confined . . . reach." *Ibid.*

The state court reached this conclusion in an attempt to

---

Conservation and Recovery Act of 1976, 90 Stat. 2795, are now codified as the Solid Waste Disposal Act, found at 42 U. S. C. § 6901 *et seq.* (1976 ed.).

From our review of this federal legislation, we find no "clear and manifest purpose of Congress," *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230, to pre-empt the entire field of interstate waste management or transportation, either by express statutory command, see *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 530–531, or by implicit legislative design, see *City of Burbank* v. *Lockheed Air Terminal*, 411 U. S. 624, 633. To the contrary, Congress expressly has provided that "the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies . . . ." 42 U. S. C. § 6901 (a)(4) (1976 ed.). Similarly, ch. 363 is not pre-empted because of a square conflict with particular provisions of federal law or because of general incompatibility with basic federal objectives. See *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 158; *Jones* v. *Rath Packing Co.*, *supra*, at 540–541. In short, we agree with the New Jersey Supreme Court that ch. 363 can be enforced consistently with the program goals and the respective federal-state roles intended by Congress when it enacted the federal legislation.

[5] U. S. Const., Art. I, § 8, cl. 3.

reconcile modern Commerce Clause concepts with several old cases of this Court holding that States can prohibit the importation of some objects because they "are not legitimate subjects of trade and commerce." *Bowman* v. *Chicago & Northwestern R. Co.*, 125 U. S. 465, 489. These articles include items "which, on account of their existing condition, would bring in and spread disease, pestilence, and death, such as rags or other substances infected with the germs of yellow fever or the virus of small-pox, or cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption." *Ibid.* See also *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 525, and cases cited therein. The state court found that ch. 363 as narrowed by the state regulations, see n. 2, *supra,* banned only "those wastes which can[not] be put to effective use," and therefore those wastes were not commerce at all, unless "the mere transportation and disposal of valueless waste between states constitutes interstate commerce within the meaning of the constitutional provision." 68 N. J., at 468, 348 A. 2d, at 514.

We think the state court misread our cases, and thus erred in assuming that they require a two-tiered definition of commerce. In saying that innately harmful articles "are not legitimate subjects of trade and commerce," the *Bowman* Court was stating its conclusion, not the starting point of its reasoning. All objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset. In *Bowman* and similar cases, the Court held simply that because the articles' worth in interstate commerce was far outweighed by the dangers inhering in their very movement, States could prohibit their transportation across state lines. Hence, we reject the state court's suggestion that the banning of "valueless" out-of-state wastes by ch. 363 implicates no constitutional protection. Just as Congress has power to regulate the interstate movement of these wastes, States are

not free from constitutional scrutiny when they restrict that movement. Cf. *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 802–814; *Meat Drivers* v. *United States,* 371 U. S. 94.

## III

### A

Although the Constitution gives Congress the power to regulate commerce among the States, many subjects of potential federal regulation under that power inevitably escape congressional attention "because of their local character and their number and diversity." *South Carolina State Highway Dept.* v. *Barnwell Bros., Inc.*, 303 U. S. 177, 185. In the absence of federal legislation, these subjects are open to control by the States so long as they act within the restraints imposed by the Commerce Clause itself. See *Raymond Motor Transportation, Inc.* v. *Rice,* 434 U. S. 429, 440. The bounds of these restraints appear nowhere in the words of the Commerce Clause, but have emerged gradually in the decisions of this Court giving effect to its basic purpose. That broad purpose was well expressed by Mr. Justice Jackson in his opinion for the Court in *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 537–538:

> "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. As the Court said in *Baldwin* v. *Seelig,* 294 U. S. [511], 527, 'what is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation.' "

The opinions of the Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental

burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected. See, *e. g., H. P. Hood & Sons, Inc., v. Du Mond, supra; Toomer v. Witsell,* 334 U. S. 385, 403–406; *Baldwin v. G. A. F. Seelig, Inc., supra; Buck v. Kuykendall,* 267 U. S. 307, 315–316. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. Cf. *Welton v. Missouri,* 91 U. S. 275. But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church, Inc.,* 397 U. S. 137, 142:

> "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

See also *Raymond Motor Transportation, Inc. v. Rice, supra,* at 441–442; *Hunt v. Washington Apple Advertising Comm'n,* 432 U. S. 333, 352–354; *Great A&P Tea Co. v. Cottrell,* 424 U. S. 366, 371–372.

The crucial inquiry, therefore, must be directed to determining whether ch. 363 is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.

## B

The purpose of ch. 363 is set out in the statute itself as follows:

> "The Legislature finds and determines that . . . the volume of solid and liquid waste continues to rapidly increase, that the treatment and disposal of these wastes continues to pose an even greater threat to the quality of the environment of New Jersey, that the available and appropriate land fill sites within the State are being diminished, that the environment continues to be threatened by the treatment and disposal of waste which originated or was collected outside the State, and that the public health, safety and welfare require that the treatment and disposal within this State of all wastes generated outside of the State be prohibited."

The New Jersey Supreme Court accepted this statement of the state legislature's purpose. The state court additionally found that New Jersey's existing landfill sites will be exhausted within a few years; that to go on using these sites or to develop new ones will take a heavy environmental toll, both from pollution and from loss of scarce open lands; that new techniques to divert waste from landfills to other methods of disposal and resource recovery processes are under development, but that these changes will require time; and finally, that "the extension of the lifespan of existing landfills, resulting from the exclusion of out-of-state waste, may be of crucial importance in preventing further virgin wetlands or other undeveloped lands from being devoted to landfill purposes." 68 N. J., at 460–465, 348 A. 2d, at 509–512. Based on these findings, the court concluded that ch. 363 was designed to protect, not the State's economy, but its environment, and that its substantial benefits outweigh its "slight" burden on interstate commerce. *Id.*, at 471–478, 348 A. 2d, at 515–519.

The appellants strenuously contend that ch. 363, "while outwardly cloaked 'in the currently fashionable garb of environ-

mental protection,' . . . is actually no more than a legislative effort to suppress competition and stabilize the cost of solid waste disposal for New Jersey residents . . . ." They cite passages of legislative history suggesting that the problem addressed by ch. 363 is primarily financial: Stemming the flow of out-of-state waste into certain landfill sites will extend their lives, thus delaying the day when New Jersey cities must transport their waste to more distant and expensive sites.

The appellees, on the other hand, deny that ch. 363 was motivated by financial concerns or economic protectionism. In the words of their brief, "[n]o New Jersey commercial interests stand to gain advantage over competitors from outside the state as a result of the ban on dumping out-of-state waste." Noting that New Jersey landfill operators are among the plaintiffs, the appellee's brief argues that "[t]he complaint is not that New Jersey has forged an economic preference for its own commercial interests, but rather that it has denied a small group of its entrepreneurs an economic opportunity to traffic in waste in order to protect the health, safety and welfare of the citizenry at large."

This dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case. Contrary to the evident assumption of the state court and the parties, the evil of protectionism can reside in legislative means as well as legislative ends. Thus, it does not matter whether the ultimate aim of ch. 363 is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents' pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected. But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against

articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in its plain effect, ch. 363 violates this principle of nondiscrimination.

The Court has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition, *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S., at 522–524; or to create jobs by keeping industry within the State, *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1, 10; *Johnson* v. *Haydel,* 278 U. S. 16; *Toomer* v. *Witsell,* 334 U. S., at 403–404; or to preserve the State's financial resources from depletion by fencing out indigent immigrants, *Edwards* v. *California,* 314 U. S. 160, 173–174. In each of these cases, a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy.

Also relevant here are the Court's decisions holding that a State may not accord its own inhabitants a preferred right of access over consumers in other States to natural resources located within its borders. *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229; *Pennsylvania* v. *West Virginia,* 262 U. S. 553. These cases stand for the basic principle that a "State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State." [6] *Foster-Fountain Packing Co.* v. *Haydel, supra,* at 10.

---

[6] We express no opinion about New Jersey's power, consistent with the Commerce Clause, to restrict to state residents access to state-owned resources, compare *Douglas* v. *Seacoast Products, Inc.,* 431 U. S. 265, 283–287, with *id.,* at 287–290 (REHNQUIST, J., concurring and dissenting); *Toomer* v. *Witsell,* 334 U. S. 385, 404; or New Jersey's power to spend state funds solely on behalf of state residents and businesses, compare *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 805–810; *id.,* at 815

The New Jersey law at issue in this case falls squarely within the area that the Commerce Clause puts off limits to state regulation. On its face, it imposes on out-of-state commercial interests the full burden of conserving the State's remaining landfill space. It is true that in our previous cases the scarce natural resource was itself the article of commerce, whereas here the scarce resource and the article of commerce are distinct. But that difference is without consequence. In both instances, the State has overtly moved to slow or freeze the flow of commerce for protectionist reasons. It does not matter that the State has shut the article of commerce inside the State in one case and outside the State in the other. What is crucial is the attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade.

The appellees argue that not all laws which facially discriminate against out-of-state commerce are forbidden protectionist regulations. In particular, they point to quarantine laws, which this Court has repeatedly upheld even though they appear to single out interstate commerce for special treatment. See *Baldwin* v. *G. A. F. Seelig, Inc., supra,* at 525; *Bowman* v. *Chicago & Northwestern R. Co.,* 125 U. S., at 489. In the appellees' view, ch. 363 is analogous to such health-protective measures, since it reduces the exposure of New Jersey residents to the allegedly harmful effects of landfill sites.

It is true that certain quarantine laws have not been considered forbidden protectionist measures, even though they were directed against out-of-state commerce. See *Asbell* v. *Kansas,* 209 U. S. 251; *Reid* v. *Colorado,* 187 U. S. 137; *Bowman* v. *Chicago & Northwestern R. Co., supra,* at 489. But those quarantine laws banned the importation of articles such as diseased livestock that required destruction as soon

(STEVENS, J., concurring), with *id.,* at 817 (BRENNAN, J., dissenting). Also compare *South Carolina State Highway Dept.* v. *Barnwell Bros., Inc.,* 303 U. S. 177, 187, with *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 783.

as possible because their very movement risked contagion and other evils. Those laws thus did not discriminate against interstate commerce as such, but simply prevented traffic in noxious articles, whatever their origin.

The New Jersey statute is not such a quarantine law. There has been no claim here that the very movement of waste into or through New Jersey endangers health, or that waste must be disposed of as soon and as close to its point of generation as possible. The harms caused by waste are said to arise after its disposal in landfill sites, and at that point, as New Jersey concedes, there is no basis to distinguish out-of-state waste from domestic waste. If one is inherently harmful, so is the other. Yet New Jersey has banned the former while leaving its landfill sites open to the latter. The New Jersey law blocks the importation of waste in an obvious effort to saddle those outside the State with the entire burden of slowing the flow of refuse into New Jersey's remaining landfill sites. That legislative effort is clearly impermissible under the Commerce Clause of the Constitution.

Today, cities in Pennsylvania and New York find it expedient or necessary to send their waste into New Jersey for disposal, and New Jersey claims the right to close its borders to such traffic. Tomorrow, cities in New Jersey may find it expedient or necessary to send their waste into Pennsylvania or New York for disposal, and those States might then claim the right to close their borders. The Commerce Clause will protect New Jersey in the future, just as it protects her neighbors now, from efforts by one State to isolate itself in the stream of interstate commerce from a problem shared by all. The judgment is

*Reversed.*

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

A growing problem in our Nation is the sanitary treatment and disposal of solid waste.[1] For many years, solid waste was

---

[1] Congress specifically recognized the substantial dangers to the environ-

incinerated. Because of the significant environmental problems attendant on incineration, however, this method of solid waste disposal has declined in use in many localities, including New Jersey. "Sanitary" landfills have replaced incineration as the principal method of disposing of solid waste. In ch. 363 of the 1973 N. J. Laws, the State of New Jersey legislatively recognized the unfortunate fact that landfills also present extremely serious health and safety problems. First, in New Jersey, "virtually all sanitary landfills can be expected to produce leachate, a noxious and highly polluted liquid which is seldom visible and frequently pollutes . . . ground and surface waters." App. 149. The natural decomposition process which occurs in landfills also produces large quantities of methane and thereby presents a significant explosion hazard. *Id.*, at 149, 156–157. Landfills can also generate "health hazards caused by rodents, fires and scavenger birds"· and, "needless to say, do not help New Jersey's aesthetic appearance nor New Jersey's noise or water or air pollution problems." Supp. App. 5.

The health and safety hazards associated with landfills present appellees with a currently unsolvable dilemma. Other, hopefully safer, methods of disposing of solid wastes are still in the development stage and cannot presently be used. But appellees obviously cannot completely stop the tide of solid waste that its citizens will produce in the interim. For the moment, therefore, appellees must continue to use sanitary landfills to dispose of New Jersey's own solid waste despite the critical environmental problems thereby created.

---

ment and public health that are posed by current methods of disposing of solid waste in the Resource Conservation and Recovery Act of 1976, 90 Stat. 2795. As the Court recognizes, *ante*, at 621 n. 4, the laws under challenge here "can be enforced consistently with the program goals and the respective federal-state roles intended by Congress when it enacted" this and other legislation and are thus not pre-empted by any federal statutes.

The question presented in this case is whether New Jersey must also continue to receive and dispose of solid waste from neighboring States, even though these will inexorably increase the health problems discussed above.[2]  The Court answers this question in the affirmative.  New Jersey must either prohibit *all* landfill operations, leaving itself to cast about for a presently nonexistent solution to the serious problem of disposing of the waste generated within its own borders, or it must accept waste from every portion of the United States, thereby multiplying the health and safety problems which would result if it dealt only with such wastes generated within the State. Because past precedents establish that the Commerce Clause does not present appellees with such a Hobson's choice, I dissent.

The Court recognizes, *ante,* at 621–622, that States can prohibit the importation of items " 'which, on account of their existing condition, would bring in and spread disease, pestilence, and death, such as rags or other substances infected with the germs of yellow fever or the virus of small-pox, or cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption.' "  *Bowman* v. *Chicago & Northwestern R. Co.,* 125 U. S. 465, 489 (1888).  See *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 525 (1935); *Sligh* v. *Kirkwood,* 237 U. S. 52, 59–60 (1915); *Asbell* v. *Kansas,* 209 U. S. 251 (1908); *Railroad Co.* v. *Husen,* 95 U. S. 465, 472 (1878). As the Court points out, such "quarantine laws have not been considered forbidden protectionist measures, *even though they were directed against out-of-state commerce." Ante,* at 628 (emphasis added).

---

[2] Regulations of the New Jersey Department of Environmental Protection "except from the ban on out-of-state refuse those types of solid waste which may have a value for recycling or for use as fuel." App. 47. Thus, the ban under challenge would appear to be strictly limited to that waste which will be disposed of in sanitary landfills and thereby pose health and safety dangers to the citizens of New Jersey.

In my opinion, these cases are dispositive of the present one. Under them, New Jersey may require germ-infected rags or diseased meat to be disposed of as best as possible within the State, but at the same time prohibit the *importation* of such items for disposal at the facilities that are set up within New Jersey for disposal of such material generated *within* the State. The physical fact of life that New Jersey must somehow dispose of its own noxious items does not mean that it must serve as a depository for those of every other State. Similarly, New Jersey should be free under our past precedents to prohibit the importation of solid waste because of the health and safety problems that such waste poses to its citizens. The fact that New Jersey continues to, and indeed must continue to, dispose of its own solid waste does not mean that New Jersey may not prohibit the importation of even more solid waste into the State. I simply see no way to distinguish solid waste, on the record of this case, from germ-infected rags, diseased meat, and other noxious items.

The Court's effort to distinguish these prior cases is unconvincing. It first asserts that the quarantine laws which have previously been upheld "banned the importation of articles such as diseased livestock that required destruction as soon as possible because their very movement risked contagion and other evils." *Ante,* at 628–629. According to the Court, the New Jersey law is distinguishable from these other laws, and invalid, because the concern of New Jersey is not with the *movement* of solid waste but with the present inability to safely *dispose* of it once it reaches its destination. But I think it far from clear that the State's law has as limited a focus as the Court imputes to it: Solid waste which is a health hazard when it reaches its destination may in all likelihood be an equally great health hazard in transit.

Even if the Court is correct in its characterization of New Jersey's concerns, I do not see why a State may ban the importation of items whose movement risks contagion, but

cannot ban the importation of items which, although they may be transported into the State without undue hazard, will then simply pile up in an ever increasing danger to the public's health and safety. The Commerce Clause was not drawn with a view to having the validity of state laws turn on such pointless distinctions.

Second, the Court implies that the challenged laws must be invalidated because New Jersey has left its landfills open to domestic waste. But, as the Court notes, *ante,* at 628, this Court has repeatedly upheld quarantine laws "even though they appear to single out interstate commerce for special treatment." The fact that New Jersey has left its landfill sites open for domestic waste does not, of course, mean that solid waste is not innately harmful. Nor does it mean that New Jersey prohibits importation of solid waste for reasons other than the health and safety of its population. New Jersey must out of sheer necessity treat and dispose of its solid waste in some fashion, just as it must treat New Jersey cattle suffering from hoof-and-mouth disease. It does not follow that New Jersey must, under the Commerce Clause, accept solid waste or diseased cattle from outside its borders and thereby exacerbate its problems.

The Supreme Court of New Jersey expressly found that ch. 363 was passed "to preserve the health of New Jersey residents by keeping their exposure to solid waste and landfill areas to a minimum." 68 N. J. 451, 473, 348 A. 2d 505, 516. The Court points to absolutely no evidence that would contradict this finding by the New Jersey Supreme Court. Because I find no basis for distinguishing the laws under challenge here from our past cases upholding state laws that prohibit the importation of items that could endanger the population of the State, I dissent.