MAPCO, INC., Plaintiff,

v.

Jack GRUNDER, District Director Ohio Department of Taxation, Department of Taxation of the State of Ohio, Edgar Lindley, Tax Commissioner of the State of Ohio, Defendants.

No. C78–295.

United States District Court,
N. D. Ohio, E. D.

March 21, 1979.

402

Kenneth G. Weinberg, James M. Friedman, Michael L. Hardy, Stanley M. Fisher, Guren, Merritt, Sogg & Cohen, Cleveland Ohio, Donald H. Hauser, CEI, Cleveland, Ohio, Frederic Dorwart, Holliman, Langholz, Runnels & Dorwart, Tulsa, Okl., for Mapco, Inc.

J. Elaine Bialczak, Asst. Atty. Gen., Columbus, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Plaintiff Mapco, Inc. has brought this action under 28 U.S.C. § 1331[1] to challenge the validity of the Coal Use Tax of Ohio (the act), O.R.C. §§ 5751.01–.99, under the commerce clause of the United States Constitution, Article I, § 8(3).[2] Mapco seeks a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that the Coal Use Tax is unconstitutional and a permanent injunction against the enforcement of the act by the defendant Ohio Department of Taxation, its district director (Mr. Jack Grunder), and Ohio's Tax Commissioner (Mr. Edgar Lindley). The defendants are also herein referred to as the Ohio Taxation Agencies.

The act which has been challenged[3] imposes a tax upon the storage, use or other

---

1. Plaintiff also invokes the jurisdiction of the court under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4). Since federal question jurisdiction involving the validity of a state statute under the commerce clause is clearly present, it is unnecessary to consider whether sections 1983, and 1343(3) and (4) provide jurisdiction.

2. Article I, section 8(3) of the United States Constitution provides:

The Congress shall have power . . . to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

3. 5751.02 Tax levied on storage or use of coal; rates of tax; purposes; exemptions

Sec. 5751.02(A) For the purpose of paying the expenses of administering the functions of the Department of Energy for the 1978–1979 fiscal biennium and financing coal-related research or any improvements designed to enable the substitution of coal or an alternative fuel, other than natural gas, for natural gas or a petroleum fuel, the conversion of coal to other fuels, or the combustion of high sulfur coal, in compliance with air or water pollution control or solid waste disposal law, including but not limited to facilities for processing coal to re-

consumption of coal. The "excise" tax is assessed against consumers who use coal in excess of two hundred tons per year for the direct generation of either steam or electric power. Electric utilities are the primary users of coal affected by the tax.

O.R.C. § 5751.02(A) recites that the Coal Use Tax was enacted to pay the expenses of the Ohio Department of Energy and to finance coal related research projects designed to develop coal as a substitute for other fuels and "for removal of . . . sulfur before the products of [sulfur] are emitted or discharged."[4]

The rate of the tax is dependent upon the sulfur content of the consumer's coal according to the following table:

| Tax per ton | Percent of sulfur content |
|---|---|
| 40 cents | Less than 0.5% |
| 35 cents | 0.5% to 1.0% |
| 30 cents | 1.0% to 1.5% |
| 15 cents | 1.5% or more |

move sulfur before combustion of the coal, for fluidized bed combustion, or for removal of the sulfur before the products of combustion are emitted or discharged, an excise tax is hereby levied on all storage, use, or other consumption in this state of coal in excess of two hundred tons in the calendar year used directly for generating steam or electric power, at the rate of forty cents per ton for coal that as delivered has a sulfur content of less than one-half of one per cent by weight expressed as elemental sulfur; thirty-five cents per ton for coal with a sulfur content of one-half of one per cent or more, but less than one per cent; thirty cents per ton for coal with a sulfur content of one per cent or more, but less than one and one-half per cent; and fifteen cents per ton for coal with a sulfur content of one and one-half per cent or more, except that the tax levied on coal that has been processed to remove sulfur before combustion of the coal shall be calculated on the basis of the sulfur content of the coal before it was processed.

· (B) Each consumer, storing, using, or otherwise consuming in this state coal in excess of two hundred tons in the calendar year used directly for generating steam or electric power shall be liable for the tax, and such liability shall not be extinguished until the tax has been paid to this state; provided that the consumer shall be relieved from further liability for the tax if the coal has previously been subject to the tax imposed by this section and the full amount of such tax has been paid.

The facts are not in dispute and the parties have each moved for summary judgment. These cross motions for summary judgment are considered upon the complaint, briefs, and supporting materials submitted to the court.

### I.

In a memorandum and order of August 10, 1978, this court overruled the defendants' motion to dismiss as to Mapco. However, the issue of Mapco's standing to maintain this action was not there considered. During the submission of the present motions, this court, by letter, requested the parties to address the question of standing. Each counsel has done so by supplemental brief. The question of standing is now considered assuming the truth of the allegations of the complaint.[5]

In *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), the Court thus summarized the question of standing:

(C) The tax imposed pursuant to division (A) of this section does not apply to the storage, use, or other consumption in this state of coal, the storage, use, or other consumption of which this state is prohibited from taxing by the Constitution of the United States, laws of the United States, or the Constitution of this state. This exemption shall not exempt from the application of the tax imposed by this section the storage, use, or other consumption of coal which was purchased in interstate commerce, but which has come to rest in this state.

4. The defendants have submitted the affidavit of Dr. Erie Johnson, an employee of the Ohio Department of Energy (ODOE) who is "responsible for overseeing all research, development and demonstration work relative to coal, coal utilization and coal production." He attests to ODOE's present projects concerning the development of coal as a fuel, and other projects that are planned to be undertaken upon the availability of funding.

5. In *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), the Court states:

For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.

In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. *E. g., Barrows v. Jackson,* 346 U.S. 249, 255–256, [73 S.Ct. 1031, 1034–1035, 97 L.Ed. 1586] (1953).

The Court in *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), thus sought to draw the often indistinguishable line between the constitutional and prudential limitations that compose standing:

> The requirement of standing is often used to describe the constitutional limitation on the jurisdiction of this Court to "cases" and "controversies" . . . Apart from the jurisdictional requirement, this Court has developed a complementary rule of self-restraint for its own governance (not always clearly distinguished from the constitutional limitation) which ordinarily precludes a person from challenging the constitutionality of state action by invoking the rights of others . . . The common thread underlying both requirements is that a person cannot challenge the constitutionality of a statute unless he shows that he himself is injured by its operation.

*Barrows,* at 255, 73 S.Ct. at 1034.

■ Under Article III's "cases" and "controversies" limitation, this court's jurisdiction may only be invoked when it is alleged that the "challenged action has caused [the plaintiff] injury in fact," *Data Processing Service v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), broadened in *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973) to an allegation of "some threatened or actual injury resulting from the putatively illegal action . . . ."

■ The challenged tax statute operates directly upon the use of Mapco's product—low-sulfur coal. Mapco has alleged in paragraph three that it sells low-sulfur coal to the Cleveland Electric Illuminating Company (CEI), "and others" who are subject to the tax. The use tax placed upon Mapco's Ohio steam generating utility customers is higher than it would be were these consumers to purchase high-sulfur coal. Construing the complaint most favorably to Mapco, the tax therefore effectively increases the price of Mapco's coal that competes for sales with high-sulfur coal in Ohio. The economic disadvantage placed upon Mapco's coal is a "threatened or actual injury resulting from the putatively illegal" Coal Use Tax. *Linda R.S. v. Richard D., supra,* at 617, 93 S.Ct. at 1148.

The Ohio Taxation Agencies have correctly pointed out that Mapco has not alleged any actual diminution of sales of its low-sulfur coal in Ohio. The defendants conclude that Mapco has therefore suffered no "injury in fact." But "[t]rade being a sensitive plant, a direct tax upon it to some extent at least deters trade even if its effect is not precisely calculable," declared Justice Frankfurter in *Freeman v. Hewit,* 329 U.S. 249, 256–57, 67 S.Ct. 274, 279, 91 L.Ed. 265 (1946).[6]

It is "interference by a State with the freedom of interstate commerce" that makes invalid "[a]n exaction by a State from interstate commerce" and not "a proven increase in the cost of the product," *Freeman v. Hewit,* 329 U.S. 249, 256–57, 67 S.Ct. 274, 279, 91 L.Ed. 265. Thus, an unconstitutional interference with the free-

---

**6.** Nor is there any warrant in the constitutional principles heretofore applied by this Court to support the notion that a State may be allowed one single tax-worth of direct interference with the free flow of commerce. An exaction by a State from interstate commerce falls not because of a proven increase in the cost of the product. What makes the tax invalid is the fact that there is interference by a State with the freedom of interstate commerce. Such a tax by the seller State alone must be judged burdensome in the context of the circumstances in which the tax takes effect. Trade being a sensitive plant, a direct tax upon it to some extent at least deters trade even if its effect is not precisely calculable.

*Freeman v. Hewit,* 329 U.S. 249, 256–57, 67 S.Ct. 274, 278–279, 91 L.Ed. 265 (1946).

dom of interstate commerce does not require a showing that the cost of the imported low-sulfur coal has been increased by the exaction of the Ohio Coal Use Tax—although this result seems reasonably likely.[7] The same interference with Mapco's sale of coal to its Ohio customers constitutes an injury to its interstate business without an actual showing that the exaction of the tax on the use of its coal in Ohio has caused Mapco's Ohio business to dwindle.

Based on the complaint, it may be concluded that the tax will likely cause an adverse effect upon Mapco's economic competitiveness. This provides Mapco's "personal stake in the outcome of the controversy," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

Moreover, the direct adversary relationship between Mapco and the Ohio Taxation Agencies is provided by the inferrable purpose of the Ohio Coal Use Tax to prefer and favor the sale of Ohio high-sulfur coal and to reduce and discourage the sale of out-of-state low-sulfur coal, the product which Mapco mines and sells in interstate commerce. Thus, in the words of *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), there is satisfaction of the Article III requirement that the "dispute sought to be adjudicated will be presented in an adversary context." In addition, the dispute is "capable of judicial resolution." The defendants are responsible for enforcing the Coal Use Tax. Upon an adjudication of illegality of the tax, they may be enjoined from further assessment of the Coal Use Tax, and the controversy would thereby be resolved.

To satisfy the prudential limitations upon the exercise of this court's jurisdiction, the allegations of Mapco's complaint must establish that it seeks to assert its own rights in this forum.

As seen in the "case or controversy" discussion, the economic handicap imposed upon Mapco's coal is an injury. This handicap is one that is suffered by vendors of low-sulfur coal; hence it is not "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205.

Mapco is asserting its constitutional right to sell coal in interstate commerce free of burdens violative of the commerce clause. This right is no less the right of Mapco because the act exacts a tax from Mapco's customers rather than from Mapco itself.[8]

---

7. The difference in use tax between high (1.5% or more) and low (less than 1.0%) sulfur coal is 20 cents per ton. In paragraph six of the complaint it is alleged that CEI alone represents a market for 7,000,000 tons of coal per year and that in 1978 CEI in fact contracted to purchase 500,000 tons of low-sulfur coal from Mapco. Through simple multiplication, it is seen that CEI must consider an additional use tax of $1,400,000.00 (7,000,000 tons/yr. × 20 cents/ton) that will be assessed upon it if it decides to purchase low-sulfur non-Ohio coal rather than high-sulfur Ohio coal to fulfill its annual needs.

   Even if Mapco's actual sale in 1978 of low-sulfur coal was only 58,136 tons (tonnage sold in the first six months of 1978 according to the affidavit of Mapco's senior vice-president), the differential use tax of 20 cents per ton ($11,-627.20) is likely to be added to the price of low-sulfur coal in comparison with the price of Ohio high-sulfur coal purchased by CEI.

8. In *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1976), Boston and five other regional stock exchanges filed an action in state court in which they alleged that the 1968 amendment to New York's long-standing tax on sales of securities violated the commerce clause. The Exchange's complaint alleged that the amendment unlawfully discriminated against interstate commerce by imposing a greater tax burden on securities transactions involving out-of-state sales than on transactions of the same magnitude involving in-state sales. The complaint further alleged that a substantial portion of the transactions on their exchanges involved securities that were subject to the New York transfer tax and that the higher tax on out-of-state sales of such securities diverted business from their facilities to exchanges in New York.

   In n. 3, the Court noted:
   This diversion was the express purpose of the challenged statute. See *infra* at 325–28, and nn. 7, 10. The allegation establishes that the statute has caused them "injury in fact," and that a case or controversy exists. 397 U.S., at 151–152, [90 S.Ct. 827.] The Exchanges are asserting their right under the Commerce Clause to engage in interstate commerce free of discriminatory taxes on their business and they allege that the trans-

Low-sulfur coal is being brought to the Ohio market by Mapco and low-sulfur coal is the commodity which is being taxed by the Coal Use Tax Act. Thus, Mapco is "arguably within the zone of interests to be protected . . . by the . . . constitutional guarantee in question." *Data Processing Service v. Camp, supra,* 397 at 153, 90 S.Ct. at 830.

## II.

■ Paragraph 8 of the complaint states, among other things, that:

. . . Since virtually all low-sulphur coal is produced outside the State of Ohio and only insignificant amounts of low-sulphur coal are produced within the State of Ohio, the Coal Use Tax curtails, burdens and penalizes the inter-state movements of low-sulphur coal to the direct commercial advantage of coal produced in Ohio. Such a discriminatory tax upon interstate commerce violates the Commerce Clause of the United States Constitution, Article I, Section 8(3).

In paragraph 5 of their answer, defendants "deny the allegations of paragraph 8 of the Complaint that the Ohio Coal Use Tax is discriminatory or that it burdens or penalizes interstate commerce in violation of any portion of the Constitution of the United States of America." However, defendants do not deny the factual statement of paragraph 8 that "virtually all low-sulphur coal is produced outside the State of Ohio and only insignificant amounts of low-sulphur coal are produced within the State of Ohio." Therefore, under Fed.R.Civ.P. 8(d), this allegation of fact is deemed "admitted."

The admission of the Ohio defendants is confirmed by the statement in their summary judgment motion memorandum:

The various exhibits and the affidavit submitted by the plaintiff with its Motion for Summary Judgment are not disputed by the defendants.

Documentary submissions offered by Mapco and unchallenged by defendants, establish that the state of Ohio does not enjoy any significant production of low-sulphur coal.

The *1977 Keystone Coal Industry Manual* (McGraw Hill) (hereafter the *Manual*), states under the heading "Chemical Characteristics and Uses:"

Most of Ohio's coal falls into the medium-to high-sulfur range. Sulfur content in the range of 1.1 to 3.0 percent is considered to be in the medium range; over 3.0 percent falls into the high range. Low-sulfur coals were formerly mined in Ohio, but most of the known reserves of these coals have been depleted.

The *Manual* includes the following production figures of "the most important seams in terms of production: "[9]

| Coal seam | 1956–75 Production millions of tons | 1956–75 Percent of total production | Average total sulfur |
|---|---|---|---|
| Pittsburgh (No. 8) | 313.5 | 37 | 3.88 |
| Middle Kittanning (No. 6) | 170.2 | 20 | 3.19 |
| Meigs Creek (No. 9) | 167.8 | 20 | 4.21 |
| Lower Freeport (No. 6A) | 50.6 | 6 | 3.16 |
| Lower Kittanning (No. 5) | 45.1 | 5 | 3.52 |
| Waynesburg (No. 11) | 22.8 | 3 | 2.82 |

fer tax indirectly infringes on that right. Thus, they are "arguably within the zone of interests to be protected . . . by the . . . constitutional guarantee in question." *Id.,* at 153, [90 S.Ct., at 829.] *Boston, supra,* at 320–321, n. 3, 97 S.Ct. at 602.

It is evident that Mapco's complaint—absent an allegation that the Ohio Coal Use Tax has caused or will cause a diminution in its business—does not have an allegation similar to the allegation of *Boston Stock Exchange.* While not a direct authority, *Boston Stock Exchange* is authority for the proposition that a nonresident may challenge the constitutionality of a state's tax even though it is not itself paying the tax. *Boston Stock Exchange* and the other regional exchanges were not taxpayers subject to the New York Stock Transfer Act (under the 1968 amendment) although some of their members were. This latter fact led the Court to also hold that "[t]he members [taxpayers] therefore suffer an actual injury within the zone of interests protected by the Commerce Clause, and the Exchanges satisfy the requirements for representational standing." *Boston Stock Exchange, supra,* at 321, n. 3, 97 S.Ct. at 602.

**9.** The *Manual* also states that 83 percent of Ohio's 1974 production "was consumed by the electrical utilities."

| Coal seam | 1956–75 Production millions of tons | 1956–75 Percent of total production | Average total sulfur |
|---|---|---|---|
| Brookville (No. 4) | 19.7 | 2 | 2.72 |
| Upper Freeport (No. 7) | 16.5 | 2 | 2.67 |
| Clarion (No. 4A) | 10.9 | 1 | 4.11 |

Mapco has also submitted a bar graph from a 1966 Bureau of Mines Information Circular 8312 that shows the total production and sulfur content of coal produced in the United States in 1964. The graph shows that among the nine major coal-producing states, Ohio ranks fifth in production and is one of the two states in which no coal of a sulfur content of one percent or less was produced.

A tabulation marked Exhibit D, "Analyses of Ohio Coals" from "Information Circular No. 47" published by the Ohio Department of Natural Resources, Division of Geological Survey in 1978 is thus summarized by plaintiff and not disputed by the defendants:

> Exhibit D shows that out of a total of 1923 coal beds surveyed throughout the state, not a single sample showed a sulphur content of less than 0.5% and only 187 samples, or less than 10% of the beds surveyed, showed a sulphur content of less than 1.5% . . . [A]pproximately only 4% of the total beds surveyed showed sulphur content of less than 1.5% in the three most significant Ohio coal seams, Pittsburgh, Middle Kittaning and Meigs Creek. . . .

Thus, it is admitted that virtually all of the coal produced in Ohio has a sulfur content in excess of 1.5 percent and that only insignificant amounts of low-sulfur coal is produced in Ohio. Based upon these undisputed facts, the central issue in this case between plaintiff Mapco and the Ohio defendants concerns plaintiff Mapco's claim, denied by the defendants, that:

> the Coal Use Tax curtails, burdens and penalizes the interstate movement of low sulphur coal to the direct commercial disadvantage of coal produced in Ohio, and [that] such a discriminatory tax upon interstate commerce violates the Commerce Clause.

In support of its claim, Mapco argues: The Coal Use Tax is tantamount to a tariff levied by the State of Ohio against coal produced outside of the State of Ohio for importation into the State of Ohio. This is necessarily so because virtually all of the coal produced in Ohio is high sulphur coal and, as such, carries the lowest rate of tax whereas the low sulphur coal, virtually all of which is produced outside of Ohio, carries the highest rate of tax when stored or used within the State of Ohio for the production of steam or the generation of electricity.

Plaintiff relies heavily on *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978)[10] where the Supreme Court recently reaffirmed that:

> . . . where simple economic protectionism is effected by state legislation, a

10. *Philadelphia v. New Jersey, supra,* held unconstitutional (reversing the New Jersey Supreme Court) Ch. 363 of the 1973 New Jersey laws. The law "closed [New Jersey's] borders to all waste from other States" with the exception of "garbage to be fed to swine" and waste allowed to enter under three other narrow exceptions promulgated by the state commissioner of the Department of Environmental Protection. The court had directed its inquiry to whether Ch. 363 is:

> . . . basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.

*Id.,* at 624, 98 S.Ct. at 2536. The Court determined that New Jersey "overtly moved to slow or freeze the flow of commerce for protectionist reasons" and that Ch. 363 was an attempt by the state "to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *Id.,* at 628, 98 S.Ct. at 2538. Reversing the New Jersey constitutional approval of Ch. 363, the Court concluded:

> The New Jersey law blocks the importation of waste in an obvious effort to saddle those outside the State with the entire burden of slowing the flow of refuse into New Jersey's remaining landfill sites. That legislative effort is clearly impermissible under the Commerce Clause of the Constitution.

*Id.,* at 629, 98 S.Ct. at 2538.

virtually *per se* rule of invalidity has been erected. *See e. g., H.P. Hood & Sons, Inc. v. DuMond,* [336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865] *supra; Toomer v. Witsell,* 334 U.S. 385, 403–406, [68 S.Ct. 1156, 1165–1167, 92 L.Ed. 1460]; *Baldwin v. G.A.F. Seelig, Inc.,* [294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032] *supra; Buck v. Kuykendall,* 267 U.S. 307, 315–316, [45 S.Ct. 324, 325–326, 69 L.Ed. 623.]

Since the New Jersey law expressly barred the entry of solid wastes into New Jersey while the Ohio Coal Use Tax does not literally bar the entry of low-sulfur coal into Ohio, *Philadelphia v. New Jersey, supra,* is not four-square. Yet, the Court's affirmation that "simple economic protectionism . . . effected by state legislation" is virtually *per se* invalid is apposite. The case cited by the Court, *Baldwin v. G.A.F. Seelig,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935),[11] contains particularly apt language:

> Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents. Restrictions so contrived are an unreasonable clog upon the mobility of commerce. They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin.

*Id.,* at 527, 55 S.Ct., at 502. In ascertaining whether the Ohio Coal Use Tax is a form of "simple economic protectionism," *Best & Co. v. Maxwell,* 311 U.S. 454, 455–456, 61 S.Ct. 334, 85 L.Ed. 275 (1940) and *Halliburton Oil Well Co. v. Reily,* 373 U.S. 64, 69, 83 S.Ct. 1201, 1203, 10 L.Ed.2d 202 (1963) make clear that:

> "In each case it is our duty to determine whether the statute under attack, what-

ever its name may be, will in its practical operation work discrimination against interstate commerce." This concern with the actuality of operation, a dominant theme running through all state taxation cases, extends to every aspect of the tax operations.

Though the language of the Coal Use Tax does not in so many words impose a burden on out-of-state coal to the favor of Ohio coal, the operation of the act does. Virtually all Ohio coal enjoys the tax rate of 15 cents per ton because Ohio does not have any significant low-sulfur coal production. Though out-of-state high-sulfur coal is subject to only the 15 cents per ton rate, the low-sulfur coal, which is necessarily out-of-state coal, is subjected to the higher tax rates of up to 40 cents per ton.

Mapco's Mr. Wilson has attested to sales to one of its Ohio customers, CEI of approximately 58,136 tons in the first half of 1978. As all of this coal falls within the range of 0.5 to 1.0 percent sulfur, it would be subject to a tax (assuming storage or use in excess of 200 tons per year, etc.) of 35 cents per ton. Thus, it costs CEI an additional $11,-627.20 (see n.7) to purchase the low-sulfur coal from Kentucky.

Surely a competent purchasing agent of a steam-electricity generating utility would consider this $11,627.20 price differential when deciding whether to purchase Ohio high-sulfur coal or Kentucky low-sulfur coal. As noted above (n.7), through the allegations of paragraph six, CEI would face an additional use tax of $1,400,000.00 per year if it fills its annual coal requirements with low-sulfur coal.

That the foregoing tax will effectively raise the price of low-sulfur coal is likely. However, for the reasons stated in Part I, an unconstitutional interference with the freedom of interstate commerce occurs even without a showing that the cost of the

---

**11.** In *Baldwin v. G.A.F. Seelig, supra,* the Court held unconstitutional as a burden upon interstate commerce a New York regulation which prohibited the sale of milk imported from an-

other state unless the price paid to the producer in that other state was up to the minimum prescribed by New York for purchases from local producers.

imported low-sulfur coal has been increased by the exaction of the Ohio Coal Use Tax. Thus, the plaintiff has shown that the tax burdens and penalizes the interstate movement of low sulfur coal. Such a discriminatory tax is a *prima facie* violation of the commerce clause, and unless the Ohio Taxation Agencies can otherwise justify this burden that has been placed upon interstate commerce, the plaintiff is entitled to summary judgment.

## III.

■ In support of the motion for summary judgment, defendants advance several propositions of law. Defendants first contend:

The Ohio Coal Use Tax does not discriminate against interstate commerce and, consequently, does not violate the commerce clause, Article I, Section 8(3) of the Constitution of the United States of America.

In support, defendants contend that the Ohio Coal Use Tax "is imposed only upon coal that has come to rest within the State of Ohio." Indeed, O.R.C. § 5751.02(C) exempts "storage, use, or other consumption of which this state is prohibited from taxing by the Constitution of the United States, laws of the United States . . ." but states that this exemption,

. . . shall not exempt from the application of the tax imposed by this section the storage, use, or other consumption of coal which was purchased in interstate commerce, but *which has come to rest in this State.* [Emphasis added.]

Defendants rely on *Henneford v. Silas Mason Co., Inc.,* 300 U.S. 577, 582, 57 S.Ct. 524, 526, 81 L.Ed. 814 (1937) [12] and its statement:

Things acquired or transported in interstate commerce may be subjected to a property tax, nondiscriminatory in its operation, when they have become part of the common mass of property within the state of destination. [Citations omitted.] For like reasons they may be subjected, once they are at rest, to a nondiscriminatory tax upon use or enjoyment.

However, the critical question is not whether the thing or product is in transit or whether it has come to rest in the state of its destination but whether the tax is " 'discriminating in its incidence against the merchandise because of its origin in another

---

**12.** Defendants also urge *A. Magnano Co. v. Hamilton,* 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109 (1934). In *A. Magnano,* a state tax statute that placed a substantial tax on oleomargarine (but not butter) was held to be valid in the face of various constitutional challenges including petitioner's contention that the statute was violative of the commerce clause. The oleomargarine served as a substitute for Washington State butter and 75 percent of the oleomargarine was produced outside Washington. In the opinion of the three judge district court, *A. Magnano Co. v. Dunbar,* 2 F.Supp. 417, 422 (W.D.Wash.1933), the oleomargarine was taxed "after it became at rest." *Id.* at 422. A long sentence, replete with literary references, tacks in the clause " . . . the man [?] of annual net profit of more than $20,000 from sale of 5,000,000 pounds of oleomargarine, not *while in interstate commerce, but after it* became at rest . . . ." The Supreme Court affirmed the district court. As to the commerce clause issue, the Court summarily concluded:

The act, considered as a whole, clearly negatives the idea that a burden is imposed upon interstate commerce, as the court below held. The tax is confined to sales within the state, and . . . has no application to sales of oleomargarine to be either imported or exported in interstate commerce.

*Magnano, supra,* 292 U.S. at 43, 54 S.Ct. at 601. After citing this language, the defendants urge: The same result should obtain here. The classification in the Ohio Coal Use Tax does not discriminate against interstate commerce. The tax applies only to coal that has come to rest within Ohio. Thus, the tax is levied only with respect to goods that have become part of the common mass of property.

Defendants' argument begs the question. It is only a property tax that is "non-discriminatory in operation" that may be imposed:

Things acquired or transported in interstate commerce may be *subjected to* a property tax, nondiscriminatory in its operation, when they have become part of the common mass of property within the state of destination.

*Henneford v. Silas Mason Co.,* 300 U.S. 577, 582, 57 S.Ct. 524, 526, 81 L.Ed. 814 (1937).

State.'" *Baldwin v. G. A. F. Seelig, supra,* 294 U.S. at 526, 55 S.Ct. at 502.[13]

Justice Cardozo, the author of *Baldwin* and *Henneford,* makes it clear in *Henneford* that the State of Washington Use Tax there in issue, while imposed on property at rest, was upheld because of its equality of application. Thus, Justice Cardozo stated:

Equality is the theme that runs through all the sections of the statute. There shall be a tax upon the use, but subject to an offset if another use or sales tax has been paid for the same thing.

*Henneford, supra,* 300 U.S. at 583–84, 57 S.Ct. at 527. Justice Cardozo further described the Washington State Use Tax:

When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed.

*Henneford, supra,* at 584, 57 S.Ct. at 527.

The difference between the Washington State Use Tax and the Ohio Coal Use Tax is the difference between equality and inequality of incidence of the tax. In contrast to Washington's Use Tax, the Ohio Use Tax law taxes low-sulfur coal transported to Ohio plants generating steam or electric power from other states at rates of 35 cents to 40 cents a ton after the low-sulfur coal comes to rest in the storage piles of the Ohio plants. But Ohio-mined high-sulfur coal shipped to the same plants and stored beside the low-sulfur coal is taxed at 15 cents a ton. The inequality is self-evident.

Defendants seek to blunt this inequality of incidence by urging that:

The state imposes a tax that treats all coal equally except insofar as the sulfur content may differ.

\*    \*    \*    \*    \*    \*

The classification of coal according to sulfur content does not discriminate against interstate commerce. It discriminates against low sulfur coal; it discriminates [in] favor of high sulfur coal. The geographic location of the mine that produced the coal is completely immaterial to the Ohio scheme.[14]

This argument blinks at the undisputed fact that Ohio produces no significant amount of low-sulfur coal. The practical operation of the tax is to discriminate against out-of-state coal shipped to Ohio consumers who must pay a higher use tax on the out-of-state low-sulfur coal than they pay on the Ohio-mined high-sulfur coal. The circumstances of the distribution of the nation's natural resources among the states does not legitimize discrimination against interstate

---

13. A state tax upon merchandise brought in from another State, or upon its sales, whether in original packages or not, after it has reached its destination and is in a state of rest, is lawful only when the tax is not discriminating in its incidence against the merchandise because of its origin in another State.

*Sonneborn Bros. v. Cureton,* 262 U.S. 506, 516, 43 S.Ct. 643, 646, 67 L.Ed. 1095 (1923), as quoted in *Baldwin v. G. A. F. Seelig, supra,* 294 U.S. at 526, 55 S.Ct. at 502.

14. The Ohio Taxation Agencies have attempted to distinguish *Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951). In *Dean Milk,* a municipal ordinance forbade the sale of milk in Madison, Wisconsin unless it had been pasteurized within five miles of the center of the city. The Court held the ordinance invalid despite the fact that it served to protect local interests in health and safety because "[i]t appears that reasonable and ade-

quate alternatives are available." *Id.* at 354, 71 S.Ct. at 298.

Emphasizing that the Coal Use Tax is silent as to the location of the coal's source, defendants argue:

The Court was at pains to point out that Madison could have achieved the same net effect by enacting an ordinance without the location limitation: [Quotation from *Dean Milk, supra,* at 354–355, 71 S.Ct. 295 omitted.] . . . Clearly, the Court was concerned with the geographic nature of the ordinance. It was found violative because of its reliance upon location.

The classification at issue in the present controversy is free from any such impermissible reliance. The Ohio tax varies only with sulfur content.

Where in practical operation all the low sulfur coal is located outside Ohio, the act is no less invalid because it is not cast in terms of location. The commerce clause forbids both forthright and insidious discrimination.

commerce in violation of the commerce clause.[15]

## IV.

■ The Ohio Taxation Agencies argue that even if it is assumed that the Coal Use Tax burdens commerce,

> the burden upon interstate commerce is exceedingly remote. It is incidental at best and is clearly outweighed by the legitimate interests of the State of Ohio in the tax.

From the cases cited in support of this proposition, defendants quote the following passage from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970): [16]

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citations omitted.]

One state interest served by the Coal Use Tax is the raising of revenue—unquestionably a legitimate state legislative function.[17]

The funds are further allocated to the Ohio Department of Energy to finance research into the better utilization of coal as an energy source—an unassailable and laudable step toward a cleaner environment and an efficient use of resources.

As stated in *H. P. Hood & Sons v. DuMond*, 336 U.S. 525, 531–32, 69 S.Ct. 657, 662, 93 L.Ed. 865 (1949), the Court recognizes "broad power in the State to protect its inhabitants against perils to health or safety, . . . even by use of measures which bear adversely upon interstate commerce." The Coal Use Tax does, of course, relate to health and safety, but only in that it raises revenues to finance activities that may eventually result in improved health and safety.

As in *Pike, supra,* 397 U.S. at 143, 90 S.Ct. at 848, the Ohio statute is not "designed to protect consumers in [Ohio] from contaminated or unfit goods." See also *Philadelphia v. New Jersey, supra,* 437 U.S. at 628–29, 98 S.Ct. 2531. More remotely, the questioned statute finances the activity that is aimed at the safeguarding of Ohioans' health and safety. It is "once removed" from the activity benefiting the people of Ohio. Hence, the Coal Use Tax's

**15.** Justice Jackson in *H. P. Hood & Sons v. DuMond*, 336 U.S. 525, at 538–39, 69 S.Ct. 657, 665, 93 L.Ed. 865, stated:

> The material success that has come to inhabitants of the states which make up this federal free trade unit has been the most impressive in the history of commerce, but the established interdependence of the states only emphasizes the necessity of protecting interstate movement of goods against local burdens and repressions. We need only consider the consequences if each of the few states that produce copper, lead, high-grade iron ore, timber, cotton, oil or gas should decree that industries located in that state shall have priority. What fantastic rivalries and dislocations and reprisals would ensue if such practices were begun!

**16.** In *Pike v. Bruce Church, Inc., supra,* the Court held invalid as violative of the commerce clause an order issued by an official of the State of Arizona to a producer of cantaloupes of superior quality. The producer grew cantalopes in Arizona and shipped them to its facility in California for sorting and packaging. The order, issued under the Arizona Fruit and Vegetable Standardization Act, prevented shipment of the Arizona cantaloupes out of that state

unless packaged as approved by the State of Arizona. This would require the producer to build a packing facility in Arizona. The Court held that Arizona's interest in having the superior cantaloupe identified as being from Arizona was outweighed by the burden placed upon the producer's allocation of its interstate resources to build an unneeded packing facility in Arizona.

**17.** Defendants cite *McGoldrick v. Berwind-White Coal Mining Co.,* 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940), to support the proposition that the out-of-state low-sulfur coal is only being assessed its fair share in an effort by the state to raise revenue. *McGoldrick* does support that proposition in the abstract; however, in that case the tax (a two percent New York City sales tax) operated "evenhandedly" upon both interstate and intrastate sales. *Id.* at 48–49, 60 S.Ct. 388. *McGoldrick* is inapplicable here since, as seen, the Coal Use Tax exacts a higher tax from out-of-state low-sulfur coal than it does from that coal's Ohio competitor. The commerce clause prevents out-of-state coal's "fair share" from being higher than Ohio coal's fair share.

burden on interstate commerce is not "incidental" to a statute operating to protect the health and safety.

The other legislative purpose, although not expressed, is deemed to be the real purpose of the act. The legislative scheme of taxation is constructed so that the Ohio Coal Use Tax rate varies inversely to the sulfur content of the coal. The higher the sulfur content (Ohio coal), the lower is the tax rate; and the lower the sulfur content, the higher is the tax rate. While not expressed in the act, the plain intent of the legislative scheme is to protect and favor the Ohio high-sulfur coal industry (both workers and management) at the expense of the out-of-state low-sulfur coal industry.

The intent of the Ohio act is understandable given the likely loss of jobs of Ohio coal miners if Ohio electric utilities decide to meet EPA standards through the purchase of low-sulfur coal rather than,

> . . . install unreliable, expensive emission control equipment called flue gas desulphurization equipment, at an estimated cost of $414,000,000 with an additional $110,000,000 required to replace the output of the generating facilities needed to operate that equipment.

However, the Court "has consistently found parochial legislation of this kind to be constitutionally invalid," *Philadelphia v. New Jersey*, 437 U.S. 617, 637, 98 S.Ct. 2531, 2537, 57 L.Ed.2d 475 (1978).[18]

Yet, even if it is assumed that a legitimate local concern is being directly served by the tax, the Court in *Pike v. Bruce Church, supra*, 397 U.S. at 142, 90 S.Ct. at 847, instructs this district court to consider:

> . . . whether [the local purpose] could be promoted as well with a lesser impact on interstate activities.

As the statute's declared purpose is to tax the use, storage and consumption of coal to raise funds for coal research, the obvious and evenhanded alternative of taxing all coal at the same rate leaps from the printed page of the statute. Were the rationality of classifications of coal for the purposes of a graduated tax to raise funds to desulfurize coal before this court, it would appear that high-sulfur coal should bear the greater share of the cost of its own improvement.

Relying on the previously quoted passage in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), defendants contend that any burden here is not "clearly excessive in relation to the putative local benefits." It is argued:

> . . . there are three facts that are absolutely crucial to a proper resolution [of this case]:
> 1) The tax is upon use, storage or consumption within Ohio.
> 2) Mapco is not a taxpayer under the Coal Use Tax.
> 3) Mapco's utility customers are part of a highly regulated industry.

This first fact has adequately been considered in dealing with the first proposition of law of the defendants. While a use tax is an appropriate state means of raising revenue, if non-discriminatory, the Ohio

---

**18.** In *Philadelphia v. New Jersey, supra*, at 637, 98 S.Ct. at 2537, the Court states:

> The Court has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition, *Baldwin v. G. A. F. Seelig, Inc.*, supra, 294 U.S., at 522–524, [55 S.Ct., at 500] *or to create jobs by keeping industry, within the State, Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10 [49 S.Ct. 1, 3, 73 L.Ed. 147]; *Johnson v. Haydel*, 278 U.S. 16, [49 S.Ct. 6, 73 L.Ed. 155]; *Toomer v. Witsell*, supra, 334 U.S., at 403–404, [68 S.Ct., at 1166]; or to preserve the State's financial resources from depletion by fencing out indigent immigrants, *Edwards v. California*, 314 U.S. 160, 173–174, [62 S.Ct. 164, 166–167, 86 L.Ed. 119]. In each of these cases, a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy. [Emphasis added.]

Again, in *Boston Stock Exchange, supra*, 429 U.S. 318, at 334–35, 97 S.Ct. at 609, the Court states:

> A State may no more use discriminatory taxes to assure that nonresidents direct their commerce to businesses within the State than to assure that residents trade only in interstate commerce.

Coal Use Tax for the reasons previously stated is discriminatory.

Defendants argue that Mapco's non-tax-payer status results in the Coal Use Tax's burden falling other than upon interstate commerce:

> Since [Mapco] does not pay the tax, it does not have any additional costs by reason of the tax. Consequently, the coal sold by Mapco does not bear the burden of the tax until after it has left Mapco's hands.

> The effect of this is obvious. If the tax were imposed upon coal while it was in Mapco's hands, Mapco would probably be forced to raise its price. There would be an immediate and direct effect upon Mapco's interstate commerce business with Ohio. The higher price would make the coal less saleable and, arguably, would result in a violation of the Commerce Clause. However, because Mapco is not a taxpayer, there is no additional cost to pass on.

The commerce clause is not concerned with who must pay the tax (or even if a tax is involved), but rather requires a determination of the effect of the operation of the state statute. As seen, the Ohio act imposes additional costs upon transactions involving non-Ohio low-sulfur coal.

The Ohio Taxation Agencies argue that the status of Mapco's customers as highly regulated public utilities assures that any burden of the act upon interstate commerce will be minimal. The argument takes two tacks. First, the burning of high-sulfur coal will be so expensive (because of the need to purchase scrubbers pursuant to an EPA order) that low-sulfur coal sales will not diminish. Secondly, the amount of the tax will not influence utility purchasing decisions because the financial burden is ultimately passed on to the consumer, and not absorbed by the utility.

The first argument is premised upon the allegation in the complaint that it would cost the public utility customers substantial sums of money for equipment to enable them to burn Ohio coal and still conform to U.S. E.P.A. $SO_2$ standards. Defendants argue:

> Given these substantial sums, it is not difficult to conclude that a utility might well pay even a premium price for low sulfur coal, content in the knowledge that such a practice is "cheaper in the long run." And, if the customers of Mapco were willing to buy the same volume of low sulfur coal after the enactment of the tax as they purchased before, there would be no "burden" on interstate commerce.

The commerce clause does not allow a state to erect trade barriers at its borders upon the justification that economic necessity will force commerce to scale those barriers.[19]

The second argument is based on the premise that Mapco's customers are public utilities which under existing Ohio law may pass on the increased cost of out-of-state coal to its own customers.[20] Defendants conclude that since the tax will therefore not be paid by Mapco's customers, that those customers will continue their out-of-state purchases without regard to assessment of the Coal Use Tax.[21] In accord with

---

**19.** See n.15 in part III for Justice Jackson's comment upon this point in *H. P. Hood & Sons, supra.*

**20.** This court does not hold that the tax is an expense which may be passed on under Ohio law, but only indulges the presumption that such is the case to the benefit of the defendants' argument.

**21.** Defendants argue:
> Consider the position of an executive of the utility who must decide whether the company should purchase low sulfur coal and pay the high tax rate or high sulfur coal and pay

for the necessary EPA equipment. Clearly, the executive will consider the company's desire to minimize expenses and keep its rates as low as possible. However, he will undoubtedly also reflect upon the fact that the higher tax is a legitimate expense which, in all probability, can be passed on to the consumer [under Ohio's laws governing public utilities]. Thus, it would not be surprising to find many utilities deciding to purchase the low sulfur coal despite the higher tax rate. The peculiar nature of the consumer-taxpayer in the case at bar tends to minimize the impact that the tax will ultimately have on interstate commerce.

*Freeman v. Hewitt, supra,* this court has ruled (in part I) that even if it is assumed that the amount of the tax is not effectively added to the price of the product, the fact would not nullify the burden that the discriminatory tax places on the flow of interstate commerce. It is immaterial whether the plants generating steam or electricity absorb the tax or pass the tax on to the ultimate consumer. The burden on interstate commerce remains.

The Ohio Coal Use Tax's burden upon interstate commerce is not one that is incidental to legislation acting directly to protect the health and safety of Ohioans. As a revenue raising measure, the tax is violative of the commerce clause for failing to employ a scheme of taxation whose impact upon intrastate and interstate commerce is evenhanded.

▇ In addition, the act's plain intent is to preserve the jobs of Ohio coal miners at the expense of the jobs of coal miners in other states, an understandable purpose, but a local interest that is inconsistent with the commerce clause. The burden imposed by the Ohio Coal Use Tax is not incidental but "clearly excessive in relation to the putative local benefits. . . ."

The defendants' motion for summary judgment is denied. The plaintiff's motion for summary judgment is granted. The Coal Use Tax of Ohio is declared to be in violation of the commerce clause of the United States Constitution, Article I, § 8(3). The Ohio Taxation Agencies are hereby enjoined from enforcing the Coal Use Tax.

IT IS SO ORDERED.