AMERICAN TRUCKING ASSOCIA-
TIONS, INC. and U.S. Xpress,
Inc., Plaintiffs,

v.

Christine Todd WHITMAN, in her official capacity as the Governor of the State of New Jersey; James Weinstein, in his official capacity as the Commissioner of the New Jersey Department of Transportation; Col. Carson Dunbar, in his official capacity as the Superintendent of the New Jersey State Police; and John J. Farmer, Jr., in his official capacity as the Attorney General of the State of New Jersey, Defendants.

No. CIV. A. 00–489(MLC).

United States District Court,
D. New Jersey.

March 22, 2001.

Michael L. Rodburg, Richard F. Ricci, Andrea B. Schwartz, Lowenstien Sandler PC, Roseland, NJ, Beth L. Law, Robert Digges, Jr., ATA Litigation Center, Inc., Alexandria, VA, for Plaintiffs.

Emily Armstrong, Patrick DeAlmeida, Jeffrey J. Miller, Brett D. Rickman, Office of N.J. Attorney General, Department of Law & Public Safety, Trenton, NJ, for Defendants.

Benjamin Clarke, DeCotiis, Fitzpatrick, Gluck, Hayden & Cole, LLP, Teaneck, NJ, for Movant, Tri–State Transportation Campaign.

Edwin W. Schmierer, Trishka Waterbury, Mason, Griffin & Pierson, PC, Princeton, NJ, for Movant, New Jersey State League of Municipalities.

## MEMORANDUM OPINION

COOPER, District Judge

This matter presents motions for partial summary judgment by both parties. We will deny the motions and develop a full evidentiary record before ruling further on the merits.

### BACKGROUND

On or about July 16, 1999, the New Jersey Department of Transportation (the "Department") enacted "emergency regulations," which applied to certain commercial vehicles categorized as double-trailer truck combinations and 102–inch wide standard truck semi-trailers ("Restricted Vehicles"). Those regulations addressed

the use of certain roads by Restricted Vehicles while traveling in the State of New Jersey (the "State"). (*See* Certification of Andrea B. Schwartz filed 10–16–00) ("Schwartz Certif.") (Ex. A: Emergency Adoptions.) The emergency regulations were adopted as final regulations (the "Regulations") on August 2, 1999.[1] (Pl.

1. The pertinent sections of the final regulations, as relevant to this dispute, provide:

**16:32–1.1 Purpose**
**The New Jersey Department of Transportation has determined that it is in New Jersey's best interest to limit interstate through travel of large trucks to the National Network, the NJ Turnpike, and the Atlantic City Expressway. Large trucks restricted herein include 102 inch wide standard trucks and double trailer truck combinations. Interstate through travel for the purposes of this chapter shall be travel with both an origin and destination outside of New Jersey. Reasonable access shall be permitted to terminals and to facilities for food, fuel, repairs, and rest.**

**16:32–1.2 Definitions**
The following words and terms, when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise. "Double-trailer truck combination" means a truck tractor-semi-trailer-trailer combination, and which meets the equipment length requirement as set forth in N.J.S.A. 39:3–84 and 23 CFR 658.13....

**"Interstate through travel" means those trips with neither an origin nor destination in New Jersey. "Intrastate access travel" means those trips with an origin and/or a destination in New Jersey.**

"102–inch wide standard truck" means a truck greater than 96 inches but not greater than 102 inches in width, exclusive of mirrors and other safety devices, and which meets the equipment length requirements as set forth in N.J.S.A. 39:3–84(3) and (4), as amended.

"Terminal" means any location where freight originates, terminates, or is handled in the transportation process and, when serviced by twin trailers, includes sufficient off-street area for ingress, egress, drop off or pick up and maneuvering of twin trailer combinations. Additionally, a motor carrier operating facility, a distribution center, or a rail, waterborne, or air terminal shall be considered the same as a terminal.

**16:32–1.3 General provisions**
(a) Double-trailer truck combinations and 102–inch wide standard trucks are permitted to operate in New Jersey only to the extent and under the conditions authorized by the rules in this chapter.

(b) For purposes of clarity, these rules do not supersede other State regulations outside of this chapter, municipal ordinances and county resolutions which may otherwise restrict or control the movements of trucks or other vehicles. An example of such a restriction is a maximum weight posting.

(c) The maximum width permitted on the routes designated in N.J.A.C. 16:32–1.4 and 1.6(c) is 102 inches, exclusive of mirrors and other safety devices.

**16:32–1.4 Designated interstate through travel routes for double-trailer truck combinations and large 102–inch wide standard trucks (National Network)**
(a) **Except as provided in N.J.A.C. 16:32–1.6,** Reasonable access to terminals and other facilities, **double-trailer truck combinations and 102–inch wide standard trucks in interstate through travel may be operated in New Jersey only on the National Network as designated in 23 CFR Part 658 in addition to the New Jersey Turnpike, and the Atlantic City Expressway.** The roads that may be used for interstate through travel are listed below and are hereinafter referred to as the "National Network": ...

**16:32–1.5 Designated intrastate access travel routes (NJ Access Network)**
(a) **The following routes are designated as intrastate access travel routes for 102–inch wide standard trucks and double-trailer truck combinations for access to terminals, businesses, pickups, and deliveries. 102–inch wide standard trucks and double-trailer truck combinations may travel freely for these purposes on these routes hereinafter referred to as the "NJ Access Network":**
1. All State routes with the exception of those listed under Appendix A, incorporated herein by reference, approximately 1,812 miles;
2. All county "500" series roads with the exception of those listed under Appendix B, incorporated herein by reference, approximately 1,734 miles;
3. Those county "600" series roads listed under Appendix C, incorporated herein by reference, approximately 80 miles; and

Br. in Supp. of Mot. for Partial Summ. J. ("Pl.Br.") at 9; Schwartz Certif. Ex. D: Final Regulations.) Under the Regulations, Restricted Vehicles traveling through the State with neither an origin nor a destination in the State, must stay on "National Network" roads and may deviate onto other roads only to access terminals and for limited distances to get food, fuel, repairs, and rest.[2] N.J.A.C. 16:32–1.6. Restricted Vehicles with origins or destinations in the State are permitted to use local roads in addition to the National Network roads. *Id.* The stated purpose of

4. The New Jersey Turnpike, the Atlantic City Expressway and the Garden State Parkway south of Exit 105. Use of these routes is subject to the regulation of the New Jersey Turnpike Authority, the South Jersey Transportation Authority and the New Jersey Highway Authority, respectively.

. . . . .

(c) Designation of any route in this chapter as an intrastate access travel route for 102–inch wide standard trucks is a designation which pertains to permissible widths only. Such designation does not always guarantee free movement of all 102–inch wide standard vehicles. Some 102–inch wide standard vehicle movements may be restricted on a route because of route or bridge weight restrictions and/or vertical clearance restrictions.

(d) 102–inch wide standard trucks may be permitted to detour off the authorized routes only to the extent necessary to by-pass road closings, and route restrictions such as weight or vertical clearance limits. 102–inch wide standard trucks shall return to the designated network as soon as practicable during a detour movement.

(e) Notwithstanding any other provisions of this chapter, 102–inch wide standard trucks in intrastate access travel shall enter and exit the State only on those specific routes designated for 102–inch standard trucks as authorized in this section and N.J.A.C. 16:32–1.4.

**16:32–1.6 Reasonable access to terminals and other facilities**

(a) Any person or terminal operator seeking reasonable access for double—trailer truck combinations, or other STAA authorized vehicles as defined in 23 CFR Part 658.5 and 658.13, or trucks wider than 96 inches but not more than 102 inches in width, from the *system designated in* N.J.A.C. 16:32–1.4, may do so by utilizing the route system as designated in N.J.A.C. 16:32–1.5, excluding the Garden State Parkway.

(b) Access from a designated route to a terminal should avoid areas considered residential as defined in N.J.S.A. 39:1–1 et seq.

(c) A double-trailer truck combination is permitted access from the system designated in N.J.A.C. 16:32–1.4 to facilities providing food, fuel, repairs and rest, within one mile roadway distance from the designated system except upon those roads, highways, streets, public alleys or other thoroughfares which cannot safely accommodate a double-trailer truck combination and are so designated by the Department.

(d) Unless otherwise prohibited, 102 inch wide standard trucks are permitted to travel up to two roadway miles from any intrastate access travel route designated in N.J.A.C. 16:32–1.5 for purposes of pickup and delivery and for access to terminals and facilities providing food, fuel, repairs and rest, except upon those roads, highways, streets, public alleys or other public *thoroughfares which cannot safely* accommodate a truck wider than 96 inches and are so designated by the Department. Truck movements which are made under the authority of this subsection must conform to all other State regulations and to any local "truck route" restrictions which have been adopted and posted as provided in N.J.S.A. 40:67–16.1 et seq.

. . . . .

2. The National Network roads are designated by the federal Surface Transportation and Assistance Act of 1982 (the "STAA"), 49 U.S.C. § 31111 *et seq.*, as those roads that make up the "National System of Interstate and Defense Highways and those classes of qualifying Federal-aid Primary System Highways as designated by the Secretary." (See Pl. Br. at 3 n. 2.) In New Jersey, these roads include Routes I–76, I–78, I–80, I–95, I–195, I–278, I–287, I–295, I–676, NJ–42, NJ–81, US–130, US–322, NJ–440, the New Jersey Turnpike, and the Atlantic City Expressway. (Def. Br. in Supp. of Mot. for Partial Summ. J. at 5.)

the Regulations is to reduce the volume of large trucks on the non-National Network highways in order to protect the health, safety, and welfare of New Jersey residents. (Def. Br. in Supp. of Mot. for Partial Summ. J. ("Def.Br.") at 1, 6; Schwartz Certif. Ex. D: Final Regulations at 16:32–1.1.)

Plaintiffs, who allege that the Regulations are unconstitutional, are the American Trucking Associations, Inc. (the "ATA") and U.S. Xpress, Inc. ("USX"). The ATA is a national trucking trade association representing more than 2,000 members including corporations, partnerships, and individual proprietorships. (Pl. Br. at 1.) The ATA, a non-profit District of Columbia corporation headquartered in Virginia, claims to be suing on behalf of its members. (Certif. of David Barefoot filed 10–16–00 ("Barefoot Certif.") ¶ 2.) USX, a Nevada corporation, is an interstate motor carrier based in Tennessee. (Certif. of Steven Cleary filed 10–16–00 ("Cleary Certif.") ¶ 2.) Both the ATA members and USX regularly engage in interstate commerce in New Jersey, often using Restricted Vehicles. (Pl. Br. at 2.)

Plaintiffs seek partial summary judgment directed to the first four counts of the Complaint respectively alleging that the regulations violate the Commerce Clause (Counts I and II), the Privileges and Immunities Clause (Count III), and the Equal Protection Clause (Count IV) of the United States Constitution. (Pl. Mot. for Partial Summ. J. filed 10–16–00.) Defendants oppose the motion and move for summary judgment on the same counts. (Def. Mot. for Partial Summ. J. filed 10–16–00.)

### DISCUSSION

#### I. Summary Judgment Standard

A motion for summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Seitzinger v. Reading Hosp. & Med. Ctr., 165 F.3d 236, 238 (3d Cir.1999) (citation omitted). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. 2548.

Once the moving party has met its initial burden, the nonmoving party must establish that a genuine issue of material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir.1985). The nonmoving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); Schoch v. First Fid. Bancorp., 912 F.2d 654, 657 (3d Cir.1990). Issues of fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. Material facts are only those facts that might affect the outcome of the action under governing law. Id.; Boyd v. Ford Motor Co., 948 F.2d 283, 285 (6th Cir. 1991). When the resolution of issues depends entirely on the interpretation of the applicable law, summary judgment is appropriate. See DiBiase v. SmithKline

*Beecham Corp.,* 48 F.3d 719, 724 (3d Cir. 1995).

## II. The Commerce Clause

The United States Constitution provides that "Congress shall have Power ... to regulate Commerce ... among the several States." U.S. Const. art. I § 8. The Commerce Clause has been construed to include an "implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.,* 451 U.S. 648, 652, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981). This implied limitation, known as the negative or dormant Commerce Clause, " 'prohibits economic protectionism-that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state economic competitors.' " *Tolchin v. Supreme Court of N.J.,* 111 F.3d 1099, 1106 (3d Cir.1997) (quoting *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)).

The first question a court must ask in performing a commerce clause analysis is whether the regulation at issue discriminates against interstate commerce. *See Old Coach Dev. Corp. v. Tanzman,* 881 F.2d 1227, 1231 (3d Cir.1989). As articulated by the Third Circuit, "[d]iscrimination against interstate commerce entails imposing a burden on out-of-state vehicles or favoring those from in-state without a comparable favor for those from out-of-state." *Larson,* 683 F.2d at 799. Discrimination on the basis of citizenship is not the only object of the Commerce Clause, however.

The Supreme Court has found discrimination where state regulation has an impact on interstate goods themselves, such as when the state regulation blocks the flow of articles in interstate commerce at a state's borders. *See Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982) (invalidating Nebraska statute limiting the use of Nebraska ground water in adjoining states); *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (invalidating Oklahoma statute prohibiting the exportation of minnows for sale); *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (invalidating New Jersey statute restricting importation of waste into the state).

*Old Coach,* 881 F.2d at 1231–32 (finding regulatory scheme that imposes costs on interstate land transactions which are not imposed on intrastate land transactions regardless of citizenship of seller impermissibly discriminates). Thus, a court may find discrimination against interstate commerce, even if the relevant statute applies evenhandedly. *Id.* (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 350–52, 97 S.Ct. 2434, 53 L.Ed.2d 383, (1977) (North Carolina law prohibiting the marketing of apples in boxes bearing gradings other than federally established ones impermissibly restricted flow of Washington apples bearing state gradings into North Carolina)).

When a state statute or regulation discriminates on its face or operates in effect to favor in-state economic interests over out-of-state interests, a heavy burden is imposed on the defender of the legislation to "demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Id.* (quoting *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)); *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). *See Tolchin,* 111 F.3d at 1107 ("*Brown–Forman* makes clear that a heightened scrutiny applies not only when legislation is facially discriminatory, but also when a

state statute or regulation's 'effect is to favor in-state economic interests over out-of-state interests ...'.") Thus, a regulation faces a heightened scrutiny standard if it is driven by a discriminatory purpose or if it has a discriminatory effect. *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. 2080; *Old Coach*, 881 F.2d at 1231, *Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 398–401 (3d Cir.1987).

■ When a state regulation is not discriminatory, or its effect on interstate commerce is incidental, the Court evaluates it pursuant to a balancing test and the regulation will be upheld unless the burdens on interstate commerce are clearly excessive in relation to the putative local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Old Coach*, 881 F.2d at 1231.

### A. Highway Safety Regulations

■ Some confusion exists as to the proper standard to apply when analyzing the constitutionality of highway safety regulations under the Commerce Clause. State regulation in the field of highway safety traditionally is accorded great deference and the Supreme Court often has articulated its reluctance to invalidate such statutes. *See Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 669, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 442–43, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) ("[i]n no field has this deference to state regulation been greater than that of highway safety regulation"); *Bradley v. Pub. Utils. Comm'n*, 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053 (1933) (upholding state's refusal to license interstate carriers over certain highways due to traffic congestion). A strong presumption of validity is given to highway safety regulations that do not discriminate on their face or in effect. *See Raymond*, 434 U.S. at 443–44, 98 S.Ct. 787. Challengers may overcome

the presumption by showing that the purported safety benefits are slight, problematic, or illusory. *Larson*, 683 F.2d at 793, 795. Absent such a showing, the court should uphold uniform safety statutes. *Id.*

In the major Commerce Clause cases involving such statutes, the Supreme Court has been openly split on the proper analysis. *See, e.g., Kassel*, 450 U.S. at 662, 101 S.Ct. 1309 (plurality opinion with some justices favoring and some rejecting balancing approach); *Raymond*, 434 U.S. at 429, 98 S.Ct. 787 (articulating balancing approach). The Third Circuit directly confronted the existence of competing standards in *American Trucking Associations, Inc. v. Larson*, 683 F.2d 787 (3d Cir.1982). Following the Supreme Court's reluctance to invalidate state regulation in the field of safety, the Third Circuit chose to apply the highly deferential standard, articulated by then-Justice Rehnquist in his *Kassel* dissent, for those cases involving nondiscriminatory highway safety regulations. *Id.; Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 405 (3d Cir.1987). The Third Circuit expressly rejected a balancing approach in the area of safety, believing a highly deferential standard to be more appropriate. *Id.* at 795. As a district court sitting in the Third Circuit, we are bound to accord uniform highway regulations such deference.

The highly-deferential standard accorded to state highway regulation applies only when the regulation is both facially neutral and neutral in effect. *See Kassel*, 450 U.S. at 675–76, 101 S.Ct. 1309; *Larson*, 683 F.2d at 795 (finding deferential standard similar to rational basis should apply for evaluating *nondiscriminatory* state regulations in the field of highway safety) (emphasis added); *Norfolk*, 822 F.2d at 405 ("This court has applied a highly deferential standard in cases involving *evenhand-*

*ed* highway safety regulations that do not create uniformity problems.") (citing *Larson*, 683 F.2d at 795 (emphasis added)). As the Court explained in *Kassel*, .

> This traditional deference "derives in part from the assumption that where such regulations do not discriminate on their face against interstate commerce, their burden usually falls on local economic interests as well as other States' economic interests, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations." ... Less deference to the legislative judgment is due, however, where the local regulation bears disproportionately on out-of-state residents and businesses.

450 U.S. at 675–76, 101 S.Ct. 1309 (quoting *Raymond*, 434 U.S. at 444 n. 18, 98 S.Ct. 787). The Third Circuit followed suit stating, "As long as the statute does not on its face or in fact discriminate against out-of-state interests or in favor of in-state interests, there is ample protection from such legislation in the democratic process itself." *Larson*, 683 F.2d at 795. The democratic process does not similarly protect against discriminatory legislation. Thus, when a regulation relating to highway safety discriminates on its face or in effect, the deferential standard does not apply and the regulation is subject to the same heightened scrutiny as any other discriminatory regulation.

■ To summarize, the Third Circuit standard with regard to highway safety regulation is as follows: for a regulation that does not discriminate on its face or in effect against out-of-state interests, a court is to accord the lawmakers great deference and uphold the statute absent a showing that the purported safety benefits are slight, illusory, or problematic. A safety regulation that is discriminatory on its face or in effect, is examined under a heightened scrutiny and is struck down unless

the proponent demonstrates that the law serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.

## B. The Regulations

Plaintiffs contend that the Regulations violate the Commerce Clause because they unfairly discriminate against out-of-state truckers in favor of local interests on their face, in their purpose, and in their effect. (Pl.Br.15–30.)

Defendants counter that the regulations do not provide an economic advantage to New Jersey truckers but apply uniformly to all Restricted Vehicles regardless of where they are from, where they are registered, whether or not the drivers live in New Jersey, or whether they are engaged in interstate commerce. (Def. Br. at 12, 13.) Defendants further contend that requiring through-state drivers to remain on the National Network roads does not place an undue burden on interstate commerce; any minor "inconveniences" demonstrated, such as increased tolls, are far outweighed by the benefits of increased safety from reducing large truck traffic on congested local roads. (*Id.* at 15–19.)

■ Our first step is to decide whether the Regulations discriminate against interstate commerce. We find that the Regulations do not discriminate on their face. While the Regulations make a distinction between trucks with and without an origin or destination in New Jersey, on their face, the Regulations apply evenhandedly without regard to citizenship of the truck driver or owner. They restrict local road access based on the existence of an origin or destination in the state; this restriction applies with equal force to all truck drivers. The restriction on its face is a neutral one.

This finding does not end our inquiry with regard to the Regulations' discrimina-

tory nature. A state regulation also discriminates when its "effect is to favor instate economic interests over out-of-state interests." *Brown Forman*, 476 U.S. at 579, 106 S.Ct. 2080. Plaintiffs allege that the Regulations will "potentially cost the trucking industry, and ultimately the national economy, millions of dollars annually." (Pl. Br. at 26.) They argue the burden comes in the form of increased toll costs, fuel consumption, and time needed to reach destinations. (*Id.* at 25–28.) They argue that the restrictions result in through-state truckers being unable to take alternative routes to avoid traffic congestion, construction, accidents, or weather-related problems. They claim that not being able to take "short cuts" results in an increase in miles driven. (Pl. Br. at 25.) Extra miles on the road, they assert, increases the likelihood of accidents. (*Id.* at 28.) Further, taking longer for some trucks to reach their destinations could result in loss of business to competitors who can deliver goods more quickly. (*Id.* at 26–27.) According to plaintiffs, these possibilities comprise a burden on through-state trucking that New Jersey-based trucking does not face.

■ We need to examine these factors when a record is more fully developed to decide if the Regulations impose actual increases in time and expense on interstate truckers. Evidence of a significant expense to out-of-state trucking not suffered by in-state trucking would demonstrate that the Regulations discriminate in their effect against out-of-state interests.[3] To make this determination on the facts currently before us would be premature. The principal commerce clause cases involving

highway safety regulation were all decided only after the development of extensive evidentiary records. *See, e.g., Kassel*, 450 U.S. 662, 101 S.Ct. 1309 (district court below heard evidence on safety and burden on commerce during fourteen-day trial); *Raymond*, 434 U.S. 429, 98 S.Ct. 787 (extensive evidence including expert testimony presented to three-judge district court below before decision); *Bibb*, 359 U.S. 520, 79 S.Ct. 962 (three-judge district court below conducted two-day hearing); *Larson*, 683 F.2d 787 (district court below conducted hearings before issuing preliminary injunction and again before deciding case on merits). Accordingly, we will deny summary judgment at this time so that a full evidentiary record may be developed.

Development of the factual record will also assist us in applying the proper standard for evaluating the Regulations. Assuming arguendo we ultimately find the Regulations discriminate in effect against interstate commerce, more facts will be required to apply the heightened scrutiny standard. Under this standard, we would uphold the Regulations only if the defendants were to demonstrate that no alternative, nondiscriminatory means exist to accomplish their legitimate local purpose.

■ The Regulations were purportedly enacted to "help ensure the safety and well-being of the people who use [New Jersey] roadways" by "limiting interstate through travel of large trucks" to certain roads. (Def. Br. at 1, 6; Schwartz Certif. Ex. D: Final Regulations at 16:32–1.1.) The state's aim is to reduce accidents and motorist deaths from truck-related collisions by reducing the number of large

---

**3.** We note that it will not be necessary for the Court to make an exact determination of the extent of discrimination. *See, e.g., Old Coach Dev. Corp. v. Tanzman*, 692 F.Supp. 424, 431 (D.N.J.1988), *aff'd*, 881 F.2d 1227 (3rd Cir. 1989) ("There is no minimum threshold test that must be satisfied in order for a statute to violate the dormant Commerce Clause."); *Maryland v. Louisiana*, 451 U.S. 725, 759–69, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) (finding precise determination of extent of discrimination not needed to conclude state tax unconstitutionally discriminated).

trucks on local roads which are mostly "two and four-lane, undivided streets, some lined with commercial establishments and homes, and others remote, winding roads in rural areas." (Def. Br. at 2, 5.) The Supreme Court has found that regulating interstate vehicular traffic to limit the volume of traffic on certain roads is a legitimate means of promoting public safety. *Bradley* 289 U.S. 92, 53 S.Ct. 577. *But see Kassel,* 450 U.S. 662, 101 S.Ct. 1309 (rejecting as unconstitutional a highway regulation whose only apparent safety benefit was to reduce overall truck traffic on state highways by forcing large trucks to detour around the state).

We find that ensuring the health and safety of its residents is a legitimate objective of the State. While plaintiffs argue that the Regulations were created with protectionist intent, based on the evidence so far, it appears that the Regulations do serve a legitimate local purpose, and would satisfy the first prong of the heightened scrutiny analysis.[4] However, at the hearing plaintiffs may submit evidence of discriminatory purpose to support their argument that the Regulations are essentially protectionist in nature.[5]

A significant issue remains as to whether the state has proven that it lacks an alternative, non-discriminatory means for achieving its purported purpose. If we ultimately find the Regulations are discriminatory, defendants will have the burden of proving that such alternative means are not viable. The viability of other possible means is a factual issue about which we have not seen much evidence. Therefore, assuming we need to make a determination regarding alternative means, evidence will be taken to that end.

Assuming, on the other hand, that we find the Regulations are not discriminatory, we will apply the highly deferential standard of review favored by the Third Circuit, and uphold the regulations absent a showing that the safety benefits are slight, problematic or illusory. Factual issues exist as to the extent of the Regulations' overall safety benefits.

Given that genuine issues of material fact exist as to the threshold issue of whether the Regulations discriminate against interstate commerce, as well as to the Regulations' purpose, the existence of nondiscriminatory alternative means, and the nature of the purported safety benefits, we find a final decision at this stage

4. Plaintiffs argue that the stated purpose of the Regulations is to protect New Jersey based business. (Pl. Br. at 17.) They rely primarily on a portion of a comment made by Commissioner Weinstein in which he stated that broadening the reach of the regulations to cover intrastate trucking "would adversely impact New Jersey based businesses and the economic competitiveness of New Jersey based businesses." (*See* 31 N.J.R. 2904.) Such a comment, taken in context and in light of all the other evidence of intent, is somewhat weak evidence that the legitimate objectives forwarded by the State are merely a pretense. *See Maine v. Taylor,* 477 U.S. at 149, 106 S.Ct. 2440 (finding paragraph near the end of 2000 word statement insufficient to prove economic protectionism). Further, the decision not to broaden the Regulations'

reach does not go to their purpose of promoting safety, but to the means employed to satisfy that purpose.

5. "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect." *Old Coach Dev. Corp. v. Tanzman,* 692 F.Supp. 424, 431 (D.N.J.1988) *aff'd* 881 F.2d 1227 (3d Cir.1989) (citing *City of Phila. v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) ("The crucial inquiry ... must be directed to determining whether [the challenged statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.")).

would be inappropriate. Accordingly, we will deny both motions for partial summary judgment.

### III. Privileges and Immunities and Equal Protection Clauses

The parties have also called for summary judgment on plaintiffs' claims that the Regulations violate the Privileges and Immunities Clause of Article IV and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. An analysis of the Regulations under either of these clauses is similar to the Commerce Clause analysis set out above. In view of our decision to deny summary judgment on plaintiffs' Commerce Clause claims, it is not necessary to discuss alternative bases for our decision. The parties may renew these alternative arguments at the hearing if desired.